## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jill Myers and James Wodziak, as co-trustees for the next of kin of Ryan Andrew Wodziak, Deceased, | Case No. 25-cv-02314-ECT-ECW<br>Judge Eric C. Tostrud |
| Plaintiffs, | |
| vs. | |
| Hennepin County, Minnesota; Hennepin Healthcare System, Inc., Laura Sloan, M.D., in her individual capacity; and Benjamin Lommen in his individual capacity, | **HENNEPIN COUNTY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |
| Defendants. | |

## INTRODUCTION

This case involves the February 2023 death of Ryan Wodziak, who died a few days after hanging himself at the Hennepin County Jail (the "Jail" or the "ADC"). Wodziak had suffered from serious mental health issues for years, was subject to a mental health commitment, and was in the middle of a mental health crisis when he was arrested for spitting on law enforcement officers in October 2022. Wodziak spent approximately four and a half months at the Jail waiting for a bed in a state psychiatric hospital, during which time the state of his mental health varied. By late January 2023, though, Wodziak's condition had improved. He was routinely receiving antipsychotic medications from medical providers and his behavior and demeanor had improved so significantly that he

was moved off suicide precautions. Tragically, Wodziak died after hanging himself on February 17, 2023, about a week after he was moved into new housing at the Jail.

Wodziak's parents are the Plaintiffs in this case. They bring federal civil rights and state law wrongful death claims against Hennepin County (since the Hennepin County Sheriff's Office ("HCSO"), which operates the Jail, is a County department), Hennepin Healthcare System, Inc. ("HHS"), and two HHS employees providing care to Jail detainees: psychiatrist Laura Sloan, M.D., and nurse Benjamin Lommen.

Plaintiffs' claims against Hennepin County fail. First, the Complaint fails to allege the existence of an unconstitutional County custom under *Monell* and *City of Canton* that decisionmakers were aware of and ignored. Indeed, although the Complaint hangs its hat as to the County on allegedly unconstitutional well-being checks, it acknowledges that the County made changes about how those checks are conducted. Such efforts show that County decisionmakers did not ignore allegedly unconstitutional behavior, as is required for a claim against the County to stand. Second, once the federal claims are dismissed, the Court should dismiss the state law claims for lack of supplemental jurisdiction.

## FACTUAL BACKGROUND[1]

### A.    Wodziak's mental health, arrest, and detention at the Jail

The Complaint alleges that Wodziak suffered from serious mental health issues, including schizoaffective disorder, which "combines symptoms of schizophrenia and mood

---

[1]    These facts are drawn from Plaintiffs' Complaint and from documents referenced in or necessarily embraced by the Complaint, which can be considered by this Court at the Rule 12 stage. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

disorders." (Complaint ("Compl.") ¶¶ 21-22.) When not properly treated, Wodziak's condition manifested in hallucination, delusion, and paranoia. (*Id.* ¶ 23.) Wodziak was committed as mentally ill in July 2021 and was under a so-called *Jarvis* order, which allows medical providers to administer "antipsychotic medications without [his] consent and, if necessary, by using force." (*Id.* ¶¶ 24-26.)

On October 3, 2022, Wodziak went to the Hennepin County Government Center, where he became so agitated that law enforcement officers came to the scene. (*Id.* ¶¶ 36-37.) Wodziak allegedly spat at the officers, was arrested, and transported to the Jail. (*Id.* ¶¶ 38-40.) Wodziak was detained at the Jail from October 3, 2022 until February 17, 2023, the day he hung himself. (*See id.* ¶¶ 36-40, 270, 278.)[2]

As the Complaint details, during the early part of his detention, Wodziak was displaying significant symptoms of psychosis. (*E.g.*, *id.* ¶¶ 44-55.) His symptoms included displays of "odd behavior," yelling, talking to himself, walking around nude, exposing himself, and throwing garbage, food, urine, and feces under his cell door. (*E.g.*, *id.* ¶¶ 49, 68-72, 98, 115-19.) These symptoms were treated with medication, including the antipsychotic Haldol, by HHS medical providers. (*E.g.*, *id.* ¶¶ 110, 121, 129, 131, 166, 247.)

Plaintiffs allege that Wodziak committed acts of self-harm on three separate occasions during his detention at the Jail. On December 17, 2022, Wodziak bit his wrist,

---

[2]    As the Complaint notes, Wodziak was found incompetent to stand trial in the criminal case in November 2022 but remained at the Jail under civil commitment while waiting for a bed at a state psychiatric facility. (Compl. ¶¶ 95, 148, 165.)

arm, and inner elbow; on January 9, 2023, he tied a sheet around his neck and then chewed at his wrists and bit his tongue; and on January 10, he again bit into his arm. (*Id.* ¶¶ 134-35, 169-76, 205-08.) Plaintiffs say these acts of self-harm were suicide attempts. Plaintiffs acknowledge that Wodziak was treated by medical providers on every one of these occasions, including by being placed on suicide precautions, placed in a restraint chair, and being transported to the Acute Psychiatric Services ("APS") department of the Hennepin County Medical Center ("HCMC") for evaluation and monitoring. (*Id.* ¶¶ 137, 139, 172, 175, 179, 210.) Repeated suicide assessments were conducted after these acts of self-harm, including on January 16, January 18, January 21, January 26, February 1, and February 11. (*Id.* ¶¶ 223, 224, 228, 231, 243, 256.)

Over time, and with the benefit of medication, Wodziak's symptoms improved. On February 11, 2023—a month after his last attempt at self-harming—he was removed from suicide precautions and moved into a new quad at the Jail. (*Compare id.* ¶ 205-08 *with id.* ¶ 254.) As the Complaint notes, well-being checks in that quad take place every 25 minutes. (*Id.* ¶ 265.) Although the Complaint alleges (conclusorily) that Wodziak was "engaging in behavior that continued to place him at a high risk for suicide" (*id.* ¶ 269), the Complaint does not describe any significantly concerning behavior on Wodziak's part from January 17 to February 11.[3] The Complaint does not allege, for example, that Wodziak had any auditory hallucinations commanding him to harm himself, episodes of akathisia, suicide

---

[3]     During that time period, the Complaint alleges only that Wodziak displayed a "flat and blunted affect" on a few occasions, that he declined wound care, that he loudly laughed to himself once, and that he sometimes declined to take propranolol and Benadryl. (Compl. ¶¶ 224, 227-28, 230-32, 241, 243, 245-46, 248-49, 259, 268.)

attempts, suicidal ideation, or meaningful symptoms of psychosis. (*See generally id.*) And it does not detail even a single incident of concerning behavior after February 11, when Wodziak was removed from suicide precautions. Nor do Plaintiffs allege that Wodziak missed any dose of antipsychotic medications during this time. (*See id.*) Plaintiffs also make no allegations about Wodziak's behavior after he was transferred to a different quad on February 11, other than that he declined some medications and wound care. (*Id.* ¶¶ 265, 269.)

**B.    Wodziak's hanging and death**

On February 17, 2023, Jail staff found Wodziak hanging with a sheet around his neck at 5:34 p.m. (*Id.* ¶¶ 275-77.) Wodziak was transported to HCMC, where he was on life support for three days, until February 20, 2023, when he was removed from life support and died. (*Id.* ¶¶ 278-80.)

The Complaint alleges that the Minnesota Department of Corrections (the "DOC") reviewed Wodziak's death. (*Id.* ¶¶ 281, 286.) By statute, the DOC is required to review every inmate death and provide recommendations on policy and training. *See* Minn. Stat. § 241.021, subd. 8. In its review of Wodziak's death, the DOC concluded that certain well-being checks were out of regulatory compliance. (Pierce Decl. Ex. 1 at 2.) The DOC found that a deputy logged a well-being check at 3:02 p.m. on February 17—2.5 hours before Wodziak was found—but had not completed one. (*Id.*) As a result, the well-being check that was conducted at 3:21 p.m. was untimely. (*Id.*) The DOC did not conclude that any alleged compliance issues contributed or were related to Wodziak's death. (*See generally id.*)

5

**C.      This lawsuit**

Plaintiffs filed the Complaint on June 3, 2025. Plaintiffs plead three claims against

the County:

- **Count II:** Under 42 U.S.C. § 1983 for violation of Wodziak's Eighth and/or Fourteenth Amendment rights, against the County and HHS (Compl. ¶¶ 351-63);

- **Count III:** Wrongful death in violation of Minnesota common law, against all Defendants (*id.* ¶¶ 364-76); and

- **Count IV:** An "injury action" claim under Minn. Stat. § 573.02, subd. 2, against all Defendants (*id.* ¶¶ 377-80).

Count II alleges a § 1983 claim against Hennepin County and HHS under *Monell v.*

*Department of Social Services of City of New York*, 436 U.S. 658 (1978) and *City of Canton*

*v. Harris*, 489 U.S. 378 (1989). Plaintiffs allege that "[s]ince 2015, more detainees have

died at Hennepin County Jail than at any other detention center in Minnesota." (*Id.* at ¶¶ 2,

289-90.)[4]

Plaintiff claims that the County, HHS, and their "final policymakers" acted with

deliberate indifference by (1) tolerating, permitting, failing to correct, promoting, or

ratifying a "number of customs, patterns, or practices that failed to provide for the serious

---

[4]      Although this motion treats all of Plaintiffs' factual allegations as true, this allegation is particularly misleading. Based on DOC's reports to the Minnesota Legislature, 10 county jails in Minnesota have higher in-custody death rates than the ADC for the years from 2021-2024. (*See* Pierce Decl. at ¶ 10.) As public records of facts that are not subject to reasonable dispute, the Court may consider the DOC's annual reports at the Rule 12 stage. *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003); *Palmer v. Cnty. of Anoka*, 200 F. Supp. 3d 842, 846 n.1 (D. Minn. 2016).

In addition, since the Hennepin County Jail is by far the state's largest jail, it is no surprise that more people have died there than at smaller facilities.

medical and mental health needs, safety, well-being, and welfare of inmates and/or detainees that presented with serious medical health concerns, including suicidality, at the Jail"; and (2) providing "constitutionally deficient medical care to Jail detainees and inmates." (*Id.* ¶¶ 353-54.)[5] Plaintiff alleges three categories of "examples" of the County's allegedly unconstitutional customs: "failing to train staff to identify inmate's risk for suicidality at the Jail"; "failing to train staff to conduct proper well-being checks"; and "failing to discipline staff for failing to conduct proper well-being checks and lying about doing so." (*Id.* ¶ 355.) Plaintiffs rests these broad allegations on two sets of facts.

First, Plaintiffs' Complaint identifies the deaths of "approximately 17" individuals who have died in the ADC or another County detention facility over the past ten years, "many" of which the Complaint says were the result of suicide. (*Id.* ¶¶ 290-330.) Plaintiffs also allege that "many" of the deaths at the Jail were due to failures in conducting well-being checks on inmates. (*E.g.*, *id.* ¶ 295.) Despite the breadth of these conclusory allegations, Plaintiffs identifies only five detainees who died at the Jail due to suicide from 2015 to February 2023, when Wodziak hung himself. (*Id.* ¶¶ 310, 314-16, 334.) Plaintiffs claim that four of these deaths—in June 2017, August 2018, September 2018, and September 2020—were caused by failures relating to well-being checks. (*Id.* ¶¶ 310, 314-

---

[5]      In addition, Plaintiffs allege that medical and non-medical Jail staff's treatment of Wodziak violated a grab bag of County and Jail policies, specifically those relating to (1) initial booking, (2) documentation of the use of pepper spray, (3) the frequency of visits by Jail medical staff, (4) administration of medication to patients under a *Jarvis* order, (5) transportation of detainees to HCMC's APS department, and (6) restraint of detainees. (Compl. ¶¶ 41-42, 73, 78, 83, 109, 216.) Plaintiffs do not allege that any of these claimed policy violations—many of which allegedly took place months before Wodziak's hanging—were somehow related to his hanging or death.

16.) Plaintiffs do not claim that well-being checks had anything to do with about J.F.'s death by suicide, in February 2021. (*Id.* ¶ 334.)

Second, as described above, Plaintiffs allege that Jail correctional staff failed to conduct timely and/or thorough well-being checks of detainees and that the DOC found various Jail well-being checks to be out of regulatory compliance. (*E.g.*, *id.* ¶¶ 295, 305.) Notably, Plaintiffs do not allege that the DOC ever found that any missed or late well-being check was related to, or caused, a detainee's death. (*See generally id.*) In fact, some DOC death review letters explicitly state that late or missed well-being checks "did not play a part" in the detainee's death. (Pierce Decl. Ex. 2 at 2; *see also* Pierce Decl. Ex. 3 at 3 (concluding that a late well-being check, which was of a detainee other than the person who died, "did not contribute to the death").)

More important, as the Complaint acknowledges, the HCSO adopted many changes to the way detention staff complete well-being checks at the Jail before Wodziak's death. For example, although the Complaint pleads that a DOC inspector found "out of compliance" well-being checks in 2018, it also acknowledges his letter also indicates that "Facility Administration is aware of this issue *and has taken steps to address it*." (*Id.* ¶ 307 (emphasis added).) In 2020, the DOC noted that it could not verify all well-being checks in one of the buildings at the Jail due to "poor camera quality," but that "[t]his issue should be rectified with the new camera system that is planned in 2021." (*Id.* ¶¶ 318-19.)

Following a September 2020 death, the Jail took even more steps to improve well-being checks, including "the addition of a full-time sergeant position to review and ensure well-being check compliance for the facility." (Pierce Decl. Ex. 2 at 2.)  In addition,

although Minnesota law requires that staggered well-being checks take place at least once every 30 minutes, Minn. R. 2911.5000, subp. 5, the HCSO changed the Jail's well-being check policy to require that checks take place every 25 minutes "in a staggered pattern." (Compl. ¶¶ 296-97; *see also* Pierce Decl. Ex. 2 at 2.) By March 2022, the DOC acknowledged that the Jail had created an auditing system to monitor deputy well-being checks:

> The facility already has a well-established system of auditing well-being checks for all Correctional Staff, which includes coaching and re-training of staff. The Administrators of the Hennepin County ADC will need to continue to be diligent with its audit process, document deficiencies and continue to hold staff accountable when well-being checks are found to be out compliance.

(Pierce Decl. Ex. 3 at 3; *see also* Pierce Decl. 1 at 2 (noting the same and that the Jail had scheduled "multiple well-being check refresher training sessions").)

Notably, the Complaint does not allege that even a single person died by suicide at the ADC after Wodziak. (*See generally* Compl.)

## ARGUMENT

The Court may dismiss a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal punctuation omitted). A claim has "facial plausibility" only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Although the Court must take all the factual allegations in the

complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990) (affirming the grant of defendant's motion to dismiss and observing that a court should not "blindly accept the legal conclusions drawn by the pleader from the facts").

## I.    Plaintiffs fail to state a plausible *Monell* or *City of Canton* claim against Hennepin County.

As an initial matter, since Plaintiffs have not even pled a constitutional violation by a Hennepin County employee, any *Monell* or *City of Canton* claims against the County necessarily fail. *See, e.g.*, *Whitney v. City of St. Louis, Mo.*, 887 F.3d 857, 861 (8th Cir. 2018) (holding that "absent a constitutional violation by [an] employee, there can be no § 1983 or *Monell* liability for the [entity]") (citing *Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017), *Sitzes v. City of W. Memphis*, 606 F.3d 461, 470 (8th Cir. 2010) (agreeing with district court that plaintiffs' claims "could not be sustained absent an underlying constitutional violation by the officer"), and *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007)).

Here, Plaintiffs do not plead a claim for deliberate indifference against any individual Jail deputy or correctional staffer. (*See generally* Compl.) Nor do they even identify any individual County employee who allegedly violated Wodziak's rights. (*See id.*) Absent such a claim, any claim that Hennepin County is liable as an entity fails. *E.g.*, *Whitney*, 887 F.3d at 861.

A.    Plaintiffs do not plausibly allege the existence of a pattern of unconstitutional conduct that County decisionmakers were aware of and ignored, as required under *Monell*.

*Monell*'s "basic rule" is "that civil rights plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was caused by a municipal policy or custom." *E.g.*, *Quinn v. Doherty*, 637 F. Supp. 3d 647, 666-67 (D. Minn. 2022) (citing *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 30-31 (2010) (internal quotation marks omitted)). Put differently, under *Monell* a municipality cannot be held liable under § 1983 simply because one of its agents or employees inflicted an injury, but instead only if the challenged action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that [municipality's] officers." *E.g.*, *id.* (citing *Monell*, 436 U.S. at 690). It is only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694; *see also Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947 (8th Cir. 2017) (observing that the Supreme Court "has set a high bar for establishing municipal liability under § 1983, and demands careful analysis from district courts, to avoid any risk that liability could be imposed under a theory of respondeat superior" because a "municipality bears responsibility for its own torts, not the torts of its employees"); *McGautha v. Jackson Cnty.*, 36 F.3d 53, 56 (8th Cir. 1994) (observing that "[r]espondeat superior does not apply under section 1983 because municipal liability is limited to conduct for which the municipality is itself actually responsible").

11

Formal policies can be the basis for *Monell* liability. Such a policy "involves a deliberate choice to follow a course of action . . . made from among various alternatives by an official who is determined by state law to have the final authority to establish governmental policy." *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998) (citation omitted, cleaned up, ellipsis in original). "To establish the existence of a policy, [Plaintiff] must point to a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Jenkins v. Cnty. of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009) (citation omitted, cleaned up).

Here, Plaintiffs do not claim that the basis for the County's liability is a formally adopted, but unconstitutional, policy. (*See generally* Compl.) Instead, Plaintiffs allege that it was unwritten County "customs, patterns, or practices" relating to well-being checks[6] that were the "moving force" behind Wodziak's death. (*E.g.*, *id.* ¶¶ 355, 357.)[7]

A custom or practice can also be the basis for liability, but a plaintiff must ultimately prove: (1) the "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by [municipal] employees;" (2) "[d]eliberate indifference to or tacit authorization of such conduct by [a municipality's] policymaking officials after notice to

---

[6]     Plaintiffs also assert that the County had unconstitutional customs of failing to "train staff to identify inmate's risk for suicidality at the Jail" and to "to discipline staff for failing to conduct proper well-being checks and lying about doing so." (*Id.* ¶ 355.) But these are bare allegations unsupported by any facts. Indeed, the Complaint pleads no facts about the County's training relating to suicide risk or about the County's discipline of staff for failing to conduct proper well-being checks or for dishonesty about those checks.

[7]     Indeed, it would be difficult for Plaintiffs to make an official policy claim because they allege that Jail and medical staff violated various standing policies, none of which are claimed to be unconstitutional. (Compl. ¶¶ 41-42, 73, 78, 83, 109, 216.)

the officials of that misconduct;" and (3) the plaintiff was injured "by acts pursuant to [the municipality's] custom, *i.e.*, [proof] that the custom was the moving force behind the constitutional violation." *Ware*, 150 F.3d at 880 (citation omitted, final alteration in original). The alleged constitutional violation must be "so pervasive among non policymaking employees of the municipality so as to constitute a custom or usage with the force of law." *Granda v. City of St. Louis*, 472 F.3d 565, 568 (8th Cir. 2007) (citation and internal punctuation omitted); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (holding that an unconstitutional custom exists when a municipality acquiesces in a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity" (citation omitted)).

To prove an unconstitutional custom, a plaintiff must show that "officials had notice of prior incidents of . . . misconduct and had deliberately failed to act on this knowledge." *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987). "Generally, an isolated incident . . . cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983." *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1061 (8th Cir. 2013). Moreover, to survive dismissal on a *Monell* custom claim, a plaintiff must allege specific facts that support the conclusion that an unconstitutional municipal custom existed. *E.g.*, *Gherity v. Pfaff*, 216 F. Supp. 3d 975, 979-80 (D. Minn. 2016); *D.B. v. Hargett*, No. 13-CV-2781 (MJD/LIB), 2014 WL 1371200, at *8 (D. Minn. Apr. 8, 2014); *Triemert v. Washington Cnty.*, No. 13-CV-1312 (PJS/JSM), 2013 WL 6729260, at *11-12 (D. Minn. Dec. 19, 2013).

Plaintiffs' claims here fail to meet these standards.

13

First, as described above, although other detainees have died at the ADC, Plaintiffs identify only four people that died by suicide from 2015 to the time of Wodziak's death in 2023[8] where alleged well-check failures were involved. (Compl. ¶¶ 310, 314-16.) This is insufficient to plead a constitutionally problematic pattern or custom. *Thelma D. ex rel. Delores A. v. Bd. of Educ. of St. Louis*, 934 F.2d 929, 933 (8th Cir. 1991) (noting that five prior incidents of alleged unconstitutional conduct over a 16-year period "cannot, as a matter of law, be said to comprise a persistent and widespread pattern of unconstitutional misconduct"); *Ruiz-Bueno v. Scott*, 639 F. App'x 354, 364 (6th Cir. 2016) (noting that 10 incidents, over an 18-year period, where deputies were "disciplined for failing to conduct security checks" were insufficient to "demonstrate a pattern of constitutional violations that satisfies the burden of proving deliberate indifference"); *Starks v. St. Louis Cnty.*, No. 4:21-CV-435 RLW, 2024 WL 940410, at *16 (E.D. Mo. Mar. 5, 2024) (noting, "[i]n isolation, twenty-plus deaths from acute withdrawal syndrome sounds like a large number, but when examined in context, tens of thousands of individuals were booked into the Jail. . . and thousands of them were suffering from drug or alcohol withdrawal" and declining

---

[8]    Plaintiffs refer to medical deaths that took place after Wodziak's. (Compl. ¶¶ 325-30). But events occurring after Wodziak's death could not possibly have put County decisionmakers on notice as of the time of his hanging in February 2023 of a pattern of unconstitutional conduct. Again, to succeed on a *Monell* claim, Plaintiffs must prove that County "officials had notice of *prior* incidents of . . . misconduct and had deliberately failed to act on this knowledge." *E.g.*, *Harris*, 821 F.2d at 504 (emphasis added); *see also Evenstad v. Cnty. of Hennepin*, No. 04-CV-1124 (JMR/FLN), 2006 WL 8445284, at *7 (D. Minn. May 22, 2006), *report and recommendation adopted*, 2006 WL 8445281 (D. Minn. July 20, 2006) (holding that "the grievances filed after the period of Plaintiff's detention do not establish the element of notice to the policymakers required to attribute *Monell* liability to the county"). Also, as alleged, none of the deaths after Wodziak's involved suicide.

to conclude such deaths were "evidence from which a fact finder could reasonably conclude there was a pattern of unconstitutional acts at the Jail" where there was no evidence "as to the circumstances of these deaths, or even whether they were similar to the circumstances of [the decedent's] death").

Second, Plaintiffs' reliance on DOC inspections following deaths at the Jail (Compl. ¶¶ 290-330) does not establish that Jail staff knowingly or deliberately engaged in unconstitutional conduct. The inspections were wide-ranging compliance reviews, and Plaintiffs do not allege that they were investigations into the cause of death or that the DOC made any findings about the cause of death. (*See generally* Compl.) In fact, on the occasions that the DOC did address cause of death, it explicitly disclaimed any connection between a late or missed well-being check and cause of death. (Pierce Decl. Ex. 2 at 2; Pierce Decl. Ex. 3 at 3.) Because there is no connection between an alleged pattern of conduct relating to well-being checks and Wodziak's death, Plaintiffs have no *Monell* claim. *E.g.*, *Brenizer v. Cnty. of Sherburne*, No. 21-CV-1301 (DSD/TNL), 2022 WL 1110203, at *8-9 (D. Minn. Feb. 1, 2022), *report and recommendation adopted*, 2022 WL 703212 (D. Minn. Mar. 9, 2022). Moreover, an allegation of a failure to comply with regulatory guidelines does not transform those failures into a matter of constitutional concern: "Jail standards, although helpful and relevant in some cases, do not represent minimum constitutional standards." *Grayson v. Ross*, 454 F.3d 802, 812 (8th Cir. 2006) (quoting *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991) (per curiam)).

Third, there is no plausible claim that County decisionmakers were aware of unconstitutional misconduct and then were deliberately indifferent to, ignored, or tacitly

authorized that misconduct. Although the Complaint pleads that the DOC found that that ADC staff completed well-being checks that were late, improperly performed, or incorrectly recorded (*e.g.*, Compl. ¶¶ 295, 305-07, 310-15, 317-20, 322, 324-25), it also alleges that the County took extensive steps to improve well-being checks. For example, the Complaint pleads that a DOC inspector found "out of compliance" well-being checks in 2018, but that his letter also indicates that "Facility Administration is aware of this issue *and has taken steps to address it*." (*Id.* ¶ 307 (emphasis added).) In 2020, the DOC noted that it could not verify all well-being checks due to "poor camera quality," but that "[t]his issue should be rectified with the new camera system that is planned in 2021." (*Id.* ¶¶ 318-19.) The Complaint also acknowledges that although Minnesota law requires that staggered well-being checks take place every 30 minutes, in 2022, the Jail changed its internal well-being check policy to require that checks take place every 25 minutes. (*Id.* ¶¶ 296-97; Pierce Decl. Ex. 2 at 2.) In addition, the DOC acknowledged the Jail's remedial efforts and "well-established system of auditing" well-being checks. (Pierce Decl. Ex. 3 at 3; Pierce Decl. Ex. 1 at 2.) The inspections also note that the Jail had engaged in ongoing training programs, above and beyond what DOC requires. (*See* Pierce Decl. Ex. 3 at 3; Pierce Decl. Ex. 1 at 3.)

Remarkably, Plaintiffs do not allege that even a single person died at the Jail as the result of suicide after Wodziak's death, by which time the Jail had implemented these changes. (*See generally* Compl.)

The fact that the County has worked in various ways to improve well-being checks precludes Plaintiffs' claim that County policymakers were deliberately indifferent to,

ignored, or tacitly authorized misconduct relating to well-being checks in the Jail. *See Wedemeier v. City of Ballwin*, 931 F.2d 24, 26 (8th Cir. 1991) (rejecting Monell claim where "the city's official policy was not ignored—the police chief found the officers violated the policy [on use of force] and disciplined them"); *Hunziker as Tr. for ALH v. Doherty*, No. 20-CV-2188 (NEB/TNL), 2021 WL 3146529, at *6 (D. Minn. July 26, 2021) (dismissing *Monell* claim after finding that Plaintiff's "allegation that Hennepin County commissioned the Casey Report in response to concerns about its child protection practices cuts against the conclusion that County policymakers were deliberately indifferent to the alleged misconduct"); *Buetenmiller v. Macomb Cnty.*, No. 20-11031, 2022 WL 203000, at *10 (E.D. Mich. Jan. 20, 2022), *aff'd sub nom. Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939 (6th Cir. 2022) (dismissing *Monell* claim where defendant "certainly did not ignore the assaults in the present case: the company immediately investigated the allegations against [an employee] and suspended him the day after it learned of the assaults"); *Myers v. City of New York*, No. 13 CIV. 1006 (PGG), 2015 WL 13881601, at *15-16 (S.D.N.Y. Sept. 30, 2015) (holding that Plaintiffs had not pled a "plausible *Monell* claim" where, "[a]ccording to the proposed Amended Complaint, City policymakers have not ignored the issue, but have instead instructed that NYPD that such tactics should not be utilized"); *Lazarde v. City of Reading*, No. CIV. 10-5139, 2012 WL 4473246, at *5 (E.D. Pa. Sept. 28, 2012) (finding *Monell* claim insufficiently pled where previous complaints "were not ignored"); *Dorgay v. Reiff*, No. 22-C-847, 2023 WL 7204967, at *2 (E.D. Wis. Feb. 16, 2023).

Finally, to the extent that Plaintiffs claim that deficient medical or mental health care was the "moving force" behind Wodziak's death (Compl. ¶¶ 354, 356-57), the Complaint does not allege that Jail staff were involved in Wodziak's medical or mental health treatment. Nor could they credibly allege that Jail staff, all of whom are laypeople, should have second-guessed the medical providers' decisions about how to evaluate and treat Wodziak. *See, e.g.*, *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1043 (8th Cir. 2006) (noting that "the law does not require a jailer to second-guess or disregard a [medical professional's] opinions or treatment recommendations"); *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002); *Anderson v. United States*, No. 11-CV-1486 (DWF/LIB), 2013 WL 1173948, at *12 (D. Minn. Jan. 25, 2013) (stating that officials who are not health care professionals do not have a constitutional duty to independently assess medical opinions, relying on *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011) and *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)).

The Court should dismiss Plaintiffs' *Monell* claim against Hennepin County because Plaintiffs have failed to plausibly identify a specific continuing, widespread, and persistent pattern of unconstitutional County misconduct and to plausibly allege that policymakers were aware of but deliberately indifferent to any such custom.

B.    Plaintiffs do not plausibly allege that Hennepin County failed to supervise or train its employees.

Likewise, the Complaint fails to state a failure-to-train-and-supervise claim against Hennepin County under § 1983 and *City of Canton*. In some "limited" circumstances, a municipality's "decision not to train employees about their legal duty to avoid violating

18

citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). But to state a claim based on a failure to train and supervise, a plaintiff must allege: (1) the municipality's training practices were inadequate; (2) the municipality was deliberately indifferent to the rights of others in adopting those training practices, "such that the failure to train reflects a deliberate or conscious choice" by the municipality; and (3) the inadequate training caused a constitutional deprivation. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (citing *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) and *Canton*, 489 U.S. at 388-89). Thus, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal punctuation and citation omitted); *see also Brenizer*, 2022 WL 1110203, at *11 ("Without sufficient facts showing that the County was on notice its training regarding prisoner exercise was inadequate, Plaintiffs have failed to state a claim for failure to train.").

Plaintiffs allege no facts that support their allegation that Hennepin County violated the Constitution by failing to train and supervise its employees. Instead, Plaintiffs simply recite the bare language that it was the unconstitutional "custom" of the County to "fail[] to train staff" (1) "to identify inmate's risk for suicidality at the Jail"; and (2) "to conduct proper well-being checks." (Compl. ¶ 355.) But the Complaint identifies no training or supervision practices that Hennepin County employed or failed to employ, no pattern of similar constitutional violations by untrained or unsupervised employees, and no facts suggesting a patently obvious constitutional violation that was caused by a failure to train

or supervise employees. (*See generally id.*) This is insufficient. *E.g.*, *Brenizer*, 2022 WL 1110203, at *11; *VanHauer v. Minneapolis Police Dep't*, No. 23-CV-1208 (ECT/LIB), 2024 WL 3540799, at *4-5 (D. Minn. July 25, 2024), *aff'd*, No. 24-2582, 2024 WL 5400262 (8th Cir. Oct. 4, 2024) (dismissing inadequate training claims since "[o]nly one allegation" in complaint related to inadequate training at one defendant and complaint did not include any training-related allegations about another defendant). Nor are the DOC's reviews evidence of such a pattern of failure to train, given the DOC's repeated acknowledgement of the ADC's training efforts. (*See* Pierce Decl. Ex. 3 at 3; Pierce Decl. Ex. 1 at 3.) Plaintiffs' *City of Canton* claim should be dismissed.

## II.    Because Wodziak was a pretrial detainee, the Eighth Amendment does not apply.

Count II of the Complaint alleges "Eighth and/or Fourteenth Amendment Violations." (Compl. at 45.) Plaintiffs acknowledges that Wodziak was arrested and then detained at the ADC. (*See generally id.*). In other words, Wodziak was a pretrial detainee and not a convicted prisoner. Therefore, his right to medical care arises under the Fourteenth Amendment's due process protections, not under the Eighth Amendment. *See, e.g.*, *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014); *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009).[9] Thus, any claims that Plaintiffs make under the Eighth Amendment claims must be dismissed.

---

[9]    As the Eighth Circuit has noted, this "makes little difference as a practical matter," since pretrial detainees "are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007).

**III.    The Court should decline jurisdiction over Plaintiffs' state law claims.**

The remaining claims are (or purport to be) statutory state actions for wrongful death (Compl. ¶¶ 364-76) and for an "injury action" (*id.* ¶¶ 377-80) (citing Minn. Stat. §§ 573.02, subd. 2). This Court only has jurisdiction over these claims under the doctrine of pendent jurisdiction. 28 U.S.C. § 1367; *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (stating the original doctrinal considerations for pendency in federal litigation).

If Plaintiffs' § 1983 claims are dismissed, as they should be, this Court should dismiss the state claims without prejudice, "for resolution to state tribunals." *Gibbs*, 383 U.S. at 726-27 ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); 28 U.S.C. § 1367(c)(3).

<u>**CONCLUSION**</u>

For these reasons, this Court should dismiss Plaintiffs' claims against Hennepin County.

Dated: August 15, 2025                    Respectfully submitted,

                                          MARY F. MORIARTY
                                          Hennepin County Attorney

                                   By: *s/ Kelly K. Pierce*
                                          LEAF MCGREGOR (#0389140)
                                          KELLY K. PIERCE (#0340716)
                                          Assistant Hennepin County Attorneys
                                          A-2000 Government Center
                                          300 South Sixth Street
                                          Minneapolis, MN 55487
                                          Telephone: (612) 348-2925
                                                     (612) 348-5488
                                          Leaf.McGregor@hennepin.us
                                          Kelly.Pierce@hennepin.us

                                          *Attorneys for Defendant Hennepin County*