## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jill Myers and James Wodziak, as co-trustees for the next of kin of Ryan Andrew Wodziak, Deceased, | Case No. 25-cv-02314-ECT-ECW |
| Plaintiffs, | **HHS DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS** |
| vs. | |
| Hennepin County, Minnesota; Hennepin Healthcare System, Inc., Laura Sloan, M.D., in her individual capacity; and Benjamin Lommen in his individual capacity, | |
| Defendants. | |

## INTRODUCTION

Ryan Wodziak ("Ryan") was arrested on October 3, 2022, while suffering a mental health crisis. He was brought to the Hennepin County Jail ("Jail or "ADC"), where he was detained for approximately five months while awaiting placement in a state facility pursuant to his civil commitment. While the ADC is not an acute psychiatric facility, Ryan was seen and treated by mental health providers throughout his detention for his complex mental health needs. He was given antipsychotic medications, sent to HCMC's Acute Psychiatry Services department when appropriate, and routinely assessed for suicide risk. Despite the efforts of medical staff, Ryan tragically died by suicide in February 2023.

Plaintiffs Jill Myers and James Wodziak have brought this action against Hennepin Healthcare System, Inc. ("HHS") and its employees, Dr. Laura Sloan, a psychiatrist, and

Nurse Benjamin Lommen (together "HHS Defendants"), and Co-Defendant Hennepin County relating to Ryan's death. Plaintiffs allege four claims against the Defendants: two claims under 42 U.S.C. § 1983 for deliberate indifference, a state wrongful death claim, and a state injury claim.

Even accepting Plaintiffs' allegations as true, the federal § 1983 claims against the HHS Defendants fail to state an actionable claim. Indeed, Plaintiffs fail to plausibly allege Dr. Sloan or Lommen were deliberately indifferent to Ryan's serious medical needs. Further, both Dr. Sloan and Lommen are entitled to qualified immunity. With respect to the municipal claim, Plaintiffs have failed to allege sufficient facts to permit this Court to reasonably infer any plausible claim. The Plaintiffs' federal claims fails, and the Court should decline to exercise jurisdiction over the remaining state law claims.

## FACTUAL BACKGROUND[1]

### I.     Ryan's Mental Health History and Arrest

According to the Complaint, Ryan was diagnosed with schizoaffective disorder several years before his detention at the ADC, which, when left untreated, would cause Ryan to "hallucinate, become severely delusional and paranoid, and have thoughts of harming himself." (Compl. ¶¶ 22–23.) In July 2021, Ryan was civilly committed as mentally ill, and "[g]iven the severity of Ryan's mental illness and issues complying with his prescribed antipsychotics, he was placed under a *Jarvis* Order", which allowed

---

[1]     These facts are drawn from Plaintiffs' Complaint, and for purposes of this Rule 12 motion only, they are accepted as true.

providers to administer prescribed antipsychotic medications without Ryan's consent. (*Id.* ¶¶ 24–26.)

On October 3, 2022, while "in the midst of a mental health crisis", Ryan was charged with felony assault and transported to the Hennepin County Jail. (*Id.* ¶¶ 36, 39.)

## II.    Medical Care and Treatment

Ryan was detained at the ADC from October 3, 2022, until February 17, 2023. (*See Id.* ¶¶ 41–280.) During that time, the Complaint alleges that jail medical staff, either physicians or nurses, saw Ryan at least 45 times. (*Id.*) Of those visits, Dr. Sloan treated Ryan on at least four occasions. (*Id.* ¶¶ 103–08, 160–63, 164–65, 233–40.) For his part, Lommen treated Ryan on at least 14 occasions. (*Id.* ¶¶ 48, 63, 111, 119, 125–27, 131–32, 147–48, 153–59, 177–78, 217–20, 221–22, 248, 256–64.)

### A.    October – November 2022

Upon initial visits with medical staff, it was noted that Ryan was displaying symptoms consistent with his mental health diagnosis, and he was evaluated by a Jail psychiatrist for "ongoing management of psychosis." (*Id.* ¶¶ 45–48, 52–55.) During his initial detention, Ryan was also placed in "'special management' housing" and mental status checks were ordered. (*Id.* ¶¶ 46–47.) On October 15, a Jail psychiatrist ordered Haldol, an antipsychotic, which could be administered pursuant to the *Jarvis* Order. (*Id.* ¶ 60.) The Complaint alleges that in October or November "Ryan did not receive his prescribed antipsychotic because he was unavailable, a no show, or refused." (*See id.* ¶¶ 61–66, 81–82, 107.) While the Complaint alleges that Ryan's "mental condition

deteriorated" during this time, there is no allegation of any self-harm or suicidal ideation during October or November. (*See id*. ¶¶ 68–102.)

**B.    December 2022**

Dr. Sloan first examined Ryan on December 2, 2022. (*Id.* ¶ 103.) Ryan's "severe psychosis" prevented a review of systems and side effects, and Dr. Sloan noted that Ryan "laid in his bed, did not answer her questions, said 'Pow, release the dragon,' and otherwise mumbled incoherently to himself." (*Id.* ¶¶ 105–06.) Dr. Sloan further noted that Ryan had not received his medication, was "responding to internal stimuli" and that his "mental health ha[d] been severely deteriorating." (*Id.* ¶ 107.) Given Ryan's condition, "Dr. Sloan recommended Ryan be transferred to HCMC's Acute Psychiatric Services department, but because of low Jail staffing, Ryan was not transported." (*Id.* ¶ 108.)

That same day, Lommen administered 10 mg of Haldol to Ryan pursuant to the *Jarvis* Order. (*Id.* ¶ 110.) Dr. Sloan also ordered Ryan receive a loading dose of 100 mg of Haldol Decanoate, a long-acting form of Haldol used to "quickly achieve therapeutic drug concentrations or prompt an immediate clinical response." (*Id.* ¶¶ 112–113.) The Haldol Decanoate was administered on December 5, 2022. (*Id.* ¶ 121.)

On December 8, 2022, Lommen visited Ryan's cell, noting that while he was still displaying "concerning behavior, [Ryan] appears better than previous interactions and the fact that he is engaging in an activity other than previous interactions and the fact that he is engaging in an activity other than previous catatonic-like state is reassuring." (*Id.* ¶ 125 (alterations in original).) The following day, Ryan told Lommen that he was "willing to take his antipsychotic medication orally" and Ryan received a 5 mg dose of Haldol that

day. (*Id.* ¶¶ 126, 129.) Ryan then received another loading dose of 100 mg of Haldol Decanoate on December 12, 2022. (*Id.* ¶ 131.)

The are no allegations in the Complaint that Ryan was displaying any suicidal ideation between December 2 and December 16. (*See id.* ¶¶ 103–33.)

On December 17, the Complaint alleges that "Ryan attempted to commit suicide by chewing the vein out of his arm so he would bleed to death." (*Id.* ¶ 134.) In response, Ryan was immediately "put on suicide precautions" and "placed in a restraint chair." (*Id.* ¶ 137.) He was thereafter transported to HCMC's Acute Psychiatric Services department for further evaluation. (*Id.* ¶ 139.) Upon evaluation, Ryan "denied having current suicidal ideation" and was ultimately discharged back to the ADC. (*Id.* ¶¶ 140–43.) Upon his return to the ADC, Ryan "remained on suicide precautions, with well-being checks happening every 15 minutes." (*Id.* ¶ 146.) Later, on December 18, Lommen removed Ryan from suicide precautions. (*Id.* ¶ 147.)

On December 23, the Complaint alleges "Ryan experienced auditory hallucinations, believed he had a device in his throat, and expressed a desire to die." (*Id.* ¶ 151.) Ryan asked to see a mental health nurse, and Lommen met with Ryan. (*Id.* ¶¶ 152–153.) After discussion, Ryan "denied any intent to harm himself" and advised Lommen "I want to die, but I'm not going to do anything about it." (*Id.* ¶ 153–59.)

Later that same day, Dr. Sloan saw Ryan for "ongoing management of psychosis." (*Id.* ¶ 160.) During this visit Dr. Sloan noted that "Ryan had auditory hallucinations about 30 minutes to an hour earlier and 'somatic delusions earlier today.'" (*Id.* ¶ 162.) She "ordered Ryan to receive 150 mg injections of the long-acting antipsychotic Haldol

Decanoate once every four weeks, starting on January 2, 2023." (*Id.* ¶ 163.) There is no allegation in the Complaint that Ryan was suicidal at this time, nor that Dr. Sloan was aware of any suicidal ideation. (*See id.* ¶¶ 160–63.)

Dr. Sloan visited Ryan again about one week later on December 30. (*Id.* ¶ 164.) With respect to this visit, the Complaint does not allege that Ryan was displaying any concerning symptoms or had any suicidal ideation. (*See id.* ¶ 164–65.) Instead, the Complaint alleges only that Dr. Sloan "noted that Ryan was currently under civil commitment with a *Jarvis* Order and that Ryan was waiting to be transferred to inpatient psychiatric care." (*Id.* ¶ 165.)

**C.    January 2023**

On January 2, "Ryan was given his injection of 150 mg Haldol Decanoate" as ordered by Dr. Sloan. (*Id.* ¶ 166.) The Complaint does not allege that Ryan was displaying any psychosis or suicidal ideation between December 24 and January 8. (*See id.* ¶¶ 164–68.)

On January 9, the Complaint alleges that Ryan attempted suicide a second time. (*Id.* ¶ 169.) In response, Ryan was again immediately "placed on suicide precautions." (*Id.* ¶ 172.) Even on precautions, Ryan "again attempted suicide by chewing at his wrist veins." (*Id.* ¶ 173.) Thus, Ryan "was placed in restraints to prevent him from biting his flesh." (*Id.* ¶ 175.) Lommen visited Ryan, and Ryan reported "auditory hallucinations instructing him to harm himself." (*Id.* ¶¶ 177–78.). Therefore, Ryan was "transferred to HCMC's Acute Psychiatric Services department". (*Id.* ¶ 179.)

Ryan was evaluated by Dr. Keul at HCMC, who noted Ryan was exhibiting "psychotic symptoms and self-harm behavior," while also opining "Schizophrenia – appears to be in partial remission." (*Id.* ¶¶ 180, 184.) Dr. Keul diagnosed Ryan with Akathisia[2] and Extrapyramidal Symptoms[3] ("EPS"), side-effects of the antipsychotic medications he was taking. (*Id.* ¶¶ 184–85, 187–88.) The Complaint alleges that Akathisia is a "recognized risk factor for suicide[.]" (*Id.* ¶ 189.) Dr. Keul "ordered that Ryan's oral Haldol be discontinued, recommended reducing his Haldol Decanoate injection from 150 mg to 100 mg, and added a different antipsychotic medication." (*Id.* ¶ 191.) Dr. Keul also prescribed Benadryl and propranolol to "manage Ryan's side effects". (*Id.* ¶ 192.)

Ryan was "monitored for several hours" at HCMC and then evaluated by a Certified Nurse Practitioner. (*Id.* ¶ 193.) The CNP "concluded that Ryan was not psychotic and discharged him back to the Jail[.]" (*Id.* ¶ 200.) Upon his return to the ADC, Ryan remained under suicide precautions and his new medications were noted. (*Id.* ¶¶ 202–04.) On January 10, Lommen also reviewed Ryan's chart, noting "the medication changes, and recommended Ryan be evaluated by Dr. Sloan for a medication review." (*Id.* ¶ 205.)

Later that day, Ryan declined wound care, which the Complaint alleges is a "recognized indicator of ongoing suicidal ideation". (*Id.* ¶ 206–07.) Approximately one hour later, the Complaint alleges Ryan "again attempted suicide by biting into his arm."

---

[2] According to the Complaint, "[a]kathisia is a neuropsychiatric syndrome marked by an inability to remain still, intense psychomotor restlessness, and overwhelming inner agitation — typically concentrated in the lower extremities." (*Id.* ¶ 187.)

[3] According to the Complaint, EPS are "drug-induced movement disorders that cause stiffness, tremors, rigidity, and involuntary muscle contractions[.]" (*Id.* ¶ 185.)

(*Id.* ¶ 208.) In response, Ryan was placed in four-point restraints for the next 8 hours. (*Id.* ¶¶ 210–11.) During that time, nursing staff checked on Ryan on six occasions. (*Id.* ¶ 213.) Lommen checked on Ryan after he was removed from the restraints. (*Id.* ¶ 217.)

On January 14, Lommen met with Ryan and conducted "a suicide safety assessment." (*Id.* ¶ 221.) Ryan reported that "he felt his auditory hallucinations had improved some since the medication change[.]" (*Id.* ¶ 222.) Additional "suicide risk assessment[s]" were performed on January 16, January 18, January 21, and January 26. (*Id.* ¶¶ 223, 224, 228, 231.) It was noted during some of these assessments that Ryan had a "flat and blunted affect", which the Complaint alleges is a clinical indicator of suicide risk. (*Id.* ¶¶ 226, 228, 231.) As the Complaint acknowledges, Ryan remained on suicide precautions during this time. (*Id.* ¶¶ 225, 229, 231.) The Complaint also acknowledges that Ryan "had remained mostly med compliant" during this time, except for declining his morning dose of Benadryl. (*Id.* ¶ 230.)

On January 27, "Dr. Sloan evaluated Ryan for ongoing management of his psychosis[.]" (*Id.* ¶ 233.) At that time, Ryan reported to Dr. Sloan that "he was not currently experiencing EPS or akathisia and elected to maintain the same antipsychotic regimen[.]" (*Id.* ¶ 236.) Dr. Sloan "deferred to Ryan's preference to remain on Haldol" while also "reducing the dosage in accordance with Dr. Keul's earlier recommendation[.]" (*Id.* ¶ 237.) Dr. Sloan also ordered that Ryan "continue receiving Benadryl 50mg four times a day and propranolol 20 mg three times a day." (*Id.* ¶ 240.) There are no allegations in the Complaint that Ryan displayed any psychosis or suicidal ideation during this visit. (*See id.* ¶¶ 233–40.) Despite this, the Complaint conclusorily alleges that "Dr. Sloan took no meaningful

action" to alter either "the jail setting [or] his medication regimen" which allegedly "were contributing to his psychiatric decline and suicidality[.]" (*Id.* ¶ 239.)

The Complaint alleges that following Dr. Sloan's visit, "Ryan continued to miss doses of propranolol" and Benadryl, and that failing to take it as "prescribed for akathisia can increase someone's risk of attempting suicide." (*Id.* ¶¶ 241, 242, 245, 249–50, 252, 255.) There are no allegations in the Complaint, however, that Ryan displayed any symptoms of akathisia or EPS from January 28 through his death. (*See id.* ¶¶ 241–80.)

**D.    February 2023**

On February 1, Ryan was "again evaluated . . . for a suicide risk assessment[.]" (*Id.* ¶ 243.) At this time, the nurse "'encouraged' Ryan to take his medications as ordered, and continued him on suicide precautions." (*Id.* ¶ 244.) On February 2, "Ryan was given his injection of 100 mg Haldol Decanoate." (*Id.* ¶ 247.)

On February 11, "Lommen evaluated Ryan for a suicide risk assessment[.]" (*Id.* ¶ 256.) Ryan had been on suicide precautions since his discharge from HCMC on January 10. (*Id.* ¶ 254.) Between January 17 and February 11, the Complaint does not allege that Ryan had any commanding auditory hallucinations, EPS symptoms, Akathisia symptoms, suicide attempts, suicidal ideation, or symptoms of psychosis (other than possibly one reference to Ryan laughing to himself (*id.* ¶ 248)). (*See id.* ¶¶ 223–53.) The Complaint alleges that Lommen "falsely charted that Ryan 'has remained med compliant'" despite "noncompliance with" Benadryl and propranolol. (*Id.* ¶¶ 257–58.) There are no allegations, however, that Ryan was not appropriately receiving his antipsychotic medications. (*See id.*)

Lommen "noted that Ryan still had auditory hallucinations", but there are no allegations in the Complaint that Ryan described commanding hallucinations to harm himself. (*Id.* ¶ 259.) There are also no allegations in the Complaint that Ryan displayed any EPS symptoms, Akathisia symptoms, suicidal ideation, or symptoms of psychosis during this visit. (*See id.* ¶¶ 256–64.) The Complaint alleges that, despite "information indicating Ryan was at a heightened risk to commit suicide", "Lommen cleared Ryan to be removed from suicide precautions." (*Id.* ¶¶ 261–64.)

The Complaint alleges that "Ryan was not evaluated for suicide risk between February 11, 2023 and February 17, 2023" despite (the conclusory allegation) that Ryan was "engaging in behavior that continued to place him at a high risk for suicide." (*Id.* ¶ 269.)

## III. Ryan's Death

At approximately 5:34 p.m. on February 17, 2023, Jail staff performed a well-being check on Ryan and found him "hanging with a sheet around his neck." (*Id.* ¶¶ 275–77.) Ryan was transported to HCMC where he was declared brain dead. (*Id.* ¶¶ 278–79.) Three days later, on February 20, 2023, Ryan was taken off life support. (*Id.* ¶ 280.)

## IV. Plaintiffs' Lawsuit

Plaintiffs filed this action on June 3, 2025. The Complaint alleges four claims against the HHS Defendants:

- **Count I:** Under 42 U.S.C. § 1983 for Eighth and/or Fourteenth Amendment Violations, against Dr. Sloan and Lommen[4] (*id.* ¶¶ 337–50);

- **Count II:** Under 42 U.S.C. § 1983 for Eighth and/or Fourteenth Amendment Violations, against HHS and Hennepin County (*id.* ¶¶ 351–63);

- **Count III:** Wrongful Death under Minnesota State Law, against the HHS Defendants and Hennepin County (*id.* ¶¶ 364–76); and

- **Count IV:** Injury Action under Minn. Stat. § 573.02, subd. 2, against the HHS Defendants and Hennepin County (*id.* ¶¶ 377–80).

Count I asserts Dr. Sloan and Lommen "acted with deliberate indifference to Ryan's serious medical needs", or, in the alternative, "knew that Ryan was suffering from these constitutional violations, had a realistic opportunity to intervene to stop these constitutional violations, but failed to intervene either maliciously or with reckless disregard for Ryan's rights." (*Id.* ¶¶ 341–42.) The Complaint further alleges that any "health and/or medical care that was provided by any of the individual Defendants deviated so substantially from professional standards that it amounted to deliberate indifference." (*Id.* ¶ 343.)

Count II alleges a claim against HHS and Hennepin County under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) and/or *City of Canton v. Harris*, 489 U.S. 378 (1989). The Complaint alleges that "Hennepin Healthcare and their final policymakers acted with deliberate indifference to the rights of Ryan and others when it tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the serious medical and mental

---

[4] As Ryan was a pretrial detainee, Plaintiffs' claims arise under the Fourteenth Amendment, not the Eighth Amendment. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).

health needs, safety, well-being, and welfare of inmates and/or detainees that presented with serious medical health concerns, including suicidality, at the Jail." (*Id.* ¶ 353.) The Complaint alleges that HHS and Hennepin County "had notice of the constitutionally deficient medical care and unconstitutional customs and practices, yet with deliberate indifference to the rights of Ryan and others, provided constitutionally deficient medical care to Jail detainees and inmates." (*Id.* ¶ 354.)

The Complaint does not identify any specific official HHS policy. Instead, HHS's purported "unconstitutional customs" include "failing to train staff to work in a correctional setting and failing to identify an inmate's risk for self-harm, suicidality, and/or death at the Jail." (*Id.* ¶ 356.)

The Complaint outlines several in-custody deaths that were allegedly the "result of a failure to conduct timely and/or adequate well-being checks on inmates." (*See id.* ¶¶ 289-330.) There is no allegation in the Complaint that medical staff are responsible for well-being checks. (*See id.*)

The Complaint also alleges that HHS has "a documented history of allowing inmates with serious psychological needs languish until the failure to provide appropriate care results in serious injury or death." (*Id.* ¶ 331.) The Complaint identifies three instances purportedly in support of this allegation. (*Id.* ¶¶ 332–34.) The entirety of those allegations state:

> 332. In 2015, Hennepin County paid a $1,000,000 settlement to Michael Shuler ("Shuler") after Schuler stabbed himself in both eyes after being held in jail for 40 days without proper psychiatric care. Schuler had been held in solitary conditions similar to Ryan.

333. Only days after Schuler had stabbed his eyes out, Tyondra Newton, who suffered from schizophrenia, hung herself after spending thirty-four days in solitary confinement.

334. In February 2021, Joshua Fury, a mentally ill man, hung himself at the Hennepin County Jail. Following Fury's death, then Sheriff Dave Hutchinson acknowledged that inmates like Fury do not belong in Jail and instead belong in facilities where "they can get talk therapy, get medication…"

(*Id.*)

With respect to Counts III and IV, Plaintiffs' state claims arise out of alleged medical malpractice. (*Id.* ¶¶ 364–80.)

HHS Defendants deny all claims.

## **LEGAL STANDARD**

The Federal Rules of Civil Procedure provide that defendants may seek to dismiss a complaint on the grounds it "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "For the purposes of a motion to dismiss, the Court takes all facts alleged in the complaint as true." *Knapp v. Hanson*, 183 F.3d 786, 788 (8th Cir. 1999). A complaint will survive a motion to dismiss only if it includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting in turn *Twombly*, 550 U.S. at 570)).

Although the Court "must take all the factual allegations in the complaint as true," it is "not bound to accept as true a legal conclusion couched as a factual allegation."

*Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990) (affirming the grant of defendant's motion to dismiss and observing that a court should not "blindly accept the legal conclusions drawn by the pleader from the facts."). When "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## ARGUMENT

I.  **Count I should be dismissed.**

A.  **Plaintiffs have not plausibly alleged Dr. Sloan and Lommen were deliberately indifferent.**

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . for redress[.]

42 U.S.C. § 1983. Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985); *see also Alsbrook v. City of Maumelle*, 184 F.3d 999, 1012 (8th Cir. 1999) ("We have consistently stated that section 1983 creates no substantive rights . . . .")).

"[E]ach defendant's conduct must be independently assessed. Section 1983 does not

sanction tort by association." *Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014) (cleaned up).

To "prevail on a claim of constitutionally inadequate medical care," the plaintiff must show the defendants' conduct amounted to "deliberate indifference to [the plaintiff's] serious medical needs." *Dulany v. Carnahan*, 132 F.3d 1234, 1237–38 (8th Cir. 1997) (citation omitted). A showing of deliberate indifference "involves both an objective and a subjective component." *Id.* at 1239; *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The plaintiff must demonstrate (1) he "suffered objectively serious medical needs" and (2) the defendant "actually knew of but deliberately disregarded those needs." *Dulany*, 132 F.3d at 1239.

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to a [constitutional violation] only if those needs are serious." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation and punctuation omitted). "An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 481 (8th Cir. 2008) (citation and punctuation omitted).

The subjective prong of deliberate indifference is "an extremely high standard," *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016), which is "difficult . . . to meet." *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 906 (8th Cir. 1999). The failure to treat a medical condition does not constitute a constitutional violation unless defendants "knew that the condition created an excessive risk to the inmate's health and then failed to

act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to "exercis[e] their independent medical judgment." *Id.* Deliberate indifference "entails a level of culpability equal to the criminal law definition of recklessness," where a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

"Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation." *Dulany*, 132 F.3d at 1239 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Medical malpractice "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106 (affirming dismissal of § 1983 claim against prison medical provider for failure to state a claim). Instead, "[i]n order to state a cognizable claim," a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" "that can offend evolving standards of decency[.]" *Id.* (citation and punctuation omitted).

In "the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind." *Id.* at 105–06 (citation and punctuation omitted). Thus, a "complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment" under the Constitution. *Id.*

at 106; *see also Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) ("Medical malpractice alone. . . is not actionable[.]").

For purposes of this Motion only, the HHS Defendants do not dispute that Ryan had an objectively serious medical need: a risk of suicide. The Complaint fails to plausibly allege, however, that Dr. Sloan and Lommen both knew of and consciously disregarded a substantial risk of suicide. Importantly, the allegations "must be viewed from [the defendants'] perspective at the time in question, not with hindsight's perfect vision", *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998), and liability is not established just because the condition resulted in death. *Grayson v. Ross*, 454 F.3d 802, 808–11 (8th Cir. 2006) (affirming denial of all Section 1983 claims despite death of pretrial detainee).

Dr. Sloan's and Lommen's conduct must be independently assessed, and "the Court must examine, for each of the individual defendants, whether and when it became apparent to them that [Ryan] had a serious medical need, and what each of the individual defendants did in response." *Starks v. St. Louis County*, No. 4:21-CV-435 RLW, 2024 WL 940410, at *9 (E.D. Mo. Mar. 5, 2024).

Importantly "suicide [itself] is not probative" of "whether the measures taken were so inadequate as to be deliberately indifferent[.]" *Rellergert ex rel. Rellergert v. Cape Girardeau County*, 924 F.2d 794, 796 (8th Cir. 1991). This is because "tying the suicide to proof of deliberate indifference is tantamount to requiring jailers to provide suicide-proof institutions[,]" and to ensure against suicide ever happening. *Id.*; *see also Brabbit ex rel. Bild v. Capra*, 59 F.4th 349, 353 (8th Cir. 2023) (per curiam) ("Jails are neither required to provide suicide-proof institutions, nor must they ensure against suicide ever happening.").

This is not the constitutional test. *Rellergert*, 924 F.2d at 796. Instead, the Court must objectively "consider[] the measures taken in light of the practical limitations on jailers to prevent inmate suicides." *Id.* "Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the Constitutional requires." *Id.* at 797.

### i. Dr. Sloan was not deliberately indifferent.

The allegations in the Complaint establish Dr. Sloan assessed and treated Ryan's mental health issues and she did not ignore a known, substantial risk of suicide. The Complaint attempts to challenge Dr. Sloan's medical judgment and decision-making, relying on the tragic outcome of Ryan's death by suicide. But this is insufficient. When the allegations regarding Dr. Sloan's care and treatment are properly viewed prospectively, it is evident that Plaintiffs have failed to plausibly allege actions or inactions that rise to the level of a constitutional violation.

Between December 2 and January 27, Dr. Sloan visited Ryan on four separate occasions to manage and treat his mental health issues. For Dr. Sloan's first three visits with Ryan (on December 2, December 23, December 30), there are no allegations in the Complaint that assert that Dr. Sloan knew of a substantial risk of suicide. And despite the conclusory allegations in the Complaint that Ryan's condition deteriorated over this time, the factual allegations demonstrate just the opposite: that Ryan's psychosis improved with treatment and medication over the course of Dr. Sloan's care. [5]

---

[5] After establishing an antipsychotic medication regimen, there are no further allegations in the Complaint of "odd" behavior from Ryan, such as exposing himself,

During Dr. Sloan's initial examination of Ryan on December 2, he displayed "severe psychosis", and his mental health was noted to be "severely deteriorating." (Compl. ¶¶ 105, 107.) While the Complaint alleges knowledge of Ryan's mental health issues, it does not allege Dr. Sloan had any knowledge of a risk of suicide at this time. (*See id.* ¶¶ 103–08.) And certainly, mental health needs do not equate to suicidality. *See, e.g.*, *Smith-Dandridge v. Geanolous*, 97 F.4th 569, 577 (8th Cir. 2024) (noting detainee's "behavior put the officers on notice of signs of mental illness. That behavior did not, however, make it obvious to them that [the detainee] had a substantial risk of suicide."). There are also no allegations in the Complaint that Ryan had exhibited any self-harming behavior or expressed any suicidal ideation while at the ADC prior to or during this initial exam. (*See* Compl.)

Even without knowledge of a substantial risk of suicide, Dr. Sloan did address Ryan's mental health needs during this visit. She first recommended Ryan be transferred to HCMC's Acute Psychiatric Services department. (*Id.* ¶ 108.) But when transport could

---

threatening others, urinating or defecating under his cell door, or making nonsensical comments or having conversations with himself, from mid-December through his death in mid-February. (*Compare* Compl. ¶ 49 (exhibiting "odd and aggressive behavior" such as banging his cuffs on the walls, rambling nonsense, and yelling at the judge), *and id.* ¶ 69 (having conversations with himself and talking "nonsense", including about killing people for fun), *and id.* ¶ 70 (standing naked outside of his cell), *and id.* ¶ 72 ("demonstrating unpredictable and odd behavior" such as threatening staff and exposing himself), *and id.* ¶ 97 ("putting water and garbage underneath his door"), *and id.* ¶ 98 ("stuffing food and random items under his cell door"), *and id.* ¶ 100 ("having conversations with 2 people who are not there in cell and makes voices for each person responding and laughing hysterically at times inappropriately"), *and id.* ¶¶ 101–02 (urinating under his door and making "several extremely graphic and nonsensical comments"), *and id.* ¶ 118 (putting "urine and feces" under his door), *with id.* ¶¶ 129–280 (ceasing "odd" behavior after establishing an antipsychotic medication regimen)).

not be completed, Dr. Sloan ordered that Ryan's antipsychotic medication be given in the Jail, and 10 mg of Haldol was administered that day. (*Id.* ¶ 110.) Haldol Decanoate, a long-acting form of Haldol used to "prompt an immediate clinical response", was also ordered and administered on December 5. *(Id.* ¶¶ 112–13, 121.)

Dr. Sloan next treated Ryan on December 23, and based on the allegations in the Complaint, Ryan showed improvement from the prior visit. While the Complaint notes Dr. Sloan knew that Ryan had "auditory hallucinations" and "somatic delusions", there is no allegation that he was continuing to experience "severe psychosis" nor are there any allegations of continued psychotic behavior during this visit. (*Id.* ¶ 162.) There are also no allegations that Ryan reported, or that Dr. Sloan was aware of, any commanding auditory hallucinations to harm himself.

Importantly, the Complaint does not allege that Dr. Sloan was aware of Ryan's alleged suicide attempt on December 17 during this visit. (*Id.* ¶ 160–63.) There are also no allegations that Dr. Sloan was aware of any suicidal ideation or behavior. (*Id.*) Dr. Sloan continued to address Ryan's ongoing mental health issues and ordered an increased dose of Haldol Decanoate to be administered every four weeks (which was given as ordered.) (*Id.* ¶ 163; *id.* ¶ 166 (dose administered on January 2); *id.* ¶ 247 (does administered on February 2))

One week later, Dr. Sloan visited Ryan for a third time on December 30. (*Id.* ¶ 164.) Again, based on the allegations in the Complaint, Ryan demonstrated continued improvement in his condition from Dr. Sloan's initial visit. Indeed, the only factual allegation in the Complaint regarding this visit is that Dr. Sloan noted Ryan was under civil

commitment with a *Jarvis* Order, and that Ryan was waiting to be transferred to inpatient psychiatric care. (*Id.* ¶¶ 164–65.) There is no allegation that Dr. Sloan was aware of a substantial risk of suicide during this visit. (*See id.*) Moreover, between Dr. Sloan's visit on December 23 through her visit on December 30, there are no allegations in the Complaint that Ryan was exhibiting any psychotic symptoms, displaying erratic or concerning behavior, or expressing suicidal ideation or engaging in self-injurious behavior—let alone allegations that Dr. Sloan was aware of the same. (*See id.* ¶¶ 163–64.)

Simply put, there are no allegations in the Complaint to establish that Dr. Sloan was aware of a substantial risk of suicide during these first three visits. Absent any knowledge of Ryan's risk of suicide, it cannot be established that Dr. Sloan was deliberately indifferent to that risk. *Long*, 86 F.3d at 765 (requiring a defendant knows a condition created an excessive risk).

Dr. Sloan's final visit with Ryan took place on January 27. (Compl. ¶ 233.) For the first time, the Complaint alleges that Dr. Sloan knew of Ryan's "history of self-harm, blunted affect, and repeated suicide attempts." (*Id.*) In addition, the Complaint alleges Dr. Sloan was aware of Ryan's recent diagnosis of akathisia and EPS, and that he was "consistently being held in solitary confinement," which the Complaint alleges are suicide risk factors. (*Id.* ¶¶ 233–34.) Significantly, at the time of Dr. Sloan's visit, and indeed from January 9 until February 11, Ryan was on suicide precautions. (*Id.* ¶¶ 172, 254.)

Despite the conclusory assertion in the Complaint that Dr. Sloan "took no meaningful action" to address Ryan's "psychiatric decline and suicidality" (*id.* ¶ 239), the allegations demonstrate that Dr. Sloan used her medical judgment to treat Ryan's

condition. Indeed, the Complaint demonstrates that Dr. Sloan made considered decisions with respect to Ryan's medication management. For example, the Complaint highlights that Dr. Sloan exercised medical decision making when weighing "that a change in antipsychotic medication 'may be of benefit'" with "Ryan's preference to remain on Haldol." (*Id.* ¶ 237.) In weighing these alternatives, Dr. Sloan also considered "Ryan's self-report that he was not currently experiencing EPS or akathisia". (*Id.* ¶ 236.) Ultimately, Dr. Sloan made the decision to keep Ryan on Haldol, but in further evidence of medical judgment, decided to reduce the dosage. (*Id.* ¶ 237.) She also ordered that Ryan continue receiving Benadryl four times per day and propranolol three times per day, which treat the side-effects of the Haldol that the Complaint alleges are suicide risk factors. (*Id.* ¶ 240.)

While Plaintiffs may disagree with Dr. Sloan's decisions in managing Ryan's condition with medication or wish that she had done something more or differently, the actions she took fall markedly short of deliberate indifference. Management of complex mental health issues is not perfect, nor does the law demand it to be. That is why it is well-settled that mere disagreements with treatment decisions do not rise to the level of constitutional violations. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (citing *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).

Here, Dr. Sloan exercised her medical judgment to use medication management for a patient who was already on suicide precautions and who had shown improvement in his mental health issues. "This exercise of professional judgment, even if negligent, falls well short of deliberate indifference." *A.H. v. St. Louis County*, 891 F.3d 721, 727 (8th Cir. 2018) (finding clinical psychologist was not deliberately indifferent to detainee's known

risk of suicide, noting "where suicidal tendencies are discovered and preventative measures taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk. The suicide is not probative of that question.").

### ii. *Lommen was not deliberately indifferent.*

The Complaint similarly fails to plausibly allege that Lommen was deliberately indifferent to a substantial risk of suicide. Between October 11 and February 11, the Complaint alleges that Lommen treated Ryan on at least fourteen separate occasions. During that time, the allegations in the Complaint demonstrate that Ryan began a consistent regimen with his antipsychotic medication, resulting in his psychotic symptoms continuing to improve over time. Ryan was placed on suicide precautions when appropriate and removed from those precautions when medical judgment dictated. Likewise, Lommen used his nursing judgment when weighing Ryan's history, symptoms, and behavior to make nursing decisions.

The Complaint alleges that Ryan's first suicide attempt was on December 17. (*Id.* ¶ 134.) Prior to that, there are no allegations in the Complaint that Ryan displayed any self-injurious behavior or reported any suicidal ideation while at the ADC. Following his attempt, Ryan was put on suicide precautions and placed in a restraint chair. (*Id.* ¶ 137.) He was then transferred to HCMC's Acute Psychiatric Services department where he was evaluated by a psychiatrist before being cleared for a safe discharge. (*Id.* ¶¶ 139–43.) The actions taken in response to Ryan's first alleged suicide attempt simply do not reflect deliberate indifference.

On December 18, Lommen, using his nursing judgment, removed Ryan from suicide precautions. (*Id.* ¶ 147.) Looking prospectively at that decision, as the law requires, at that time Ryan had denied current suicidal ideation at the hospital and had remained on suicide precautions upon return to the ADC without further incident. *See Smith-Dandridge*, 97 F.4th at 577 (noting when detainee denied suicidal ideation, it "was reasonable for defendants to take [detainee's] response into account" when determining suicide risk). Ryan had also begun taking his antipsychotic medication, including at least one 10 mg dose of Haldol on December 2 (*id.* ¶ 110), a loading dose of 100 mg of Haldol Decanoate on December 5 (*id.* ¶ 121), a 5 mg dose of Haldol on December 9 (*id.* ¶ 129), and a second loading dose of 100 mg of Haldol Decanoate on December 12 (*id.* ¶ 131).

By this time, Lommen was also well-acquainted with Ryan, having treated him on at least 7 prior occasions. On one of these visits, Lommen specifically noted Ryan's improvement, noting that Ryan "appear[ed] better than previous interactions" and that his behavior was "reassuring." (*Id.* ¶ 125.) Ryan was also beginning to demonstrate more organized thinking and the ability to appropriately communicate, advising Lommen on December 9 that he was willing to comply with oral antipsychotic medications. (*Id.* ¶ 126.) Based on all the information Lommen had at the time, he made the nursing decision to remove Ryan from suicide precautions. While Plaintiffs may disagree with Lommen's nursing decision, such a disagreement goes to the adequacy of the treatment provided, it does not demonstrate willful ignorance of a known risk.

The Complaint alleges that Ryan again attempted suicide on January 9, first by tying a sheet around his neck and subsequently by biting his wrist. (*Id.* ¶¶ 169–70, 173.) Ryan

was immediately put on suicide precautions. (*Id.* ¶ 172.) Lommen met with Ryan, and Ryan reported he "continued to have auditory hallucinations instructing him to harm himself." (*Id.* ¶¶ 177–78.) As a result, Lommen sent Ryan to HCMC's Acute Psychiatric Services department, where he was evaluated by a psychiatrist that day. (*Id.* ¶ 179.) Once again, actions including placing Ryan on suicide precautions and sending him to the hospital cannot form the basis for a plausible deliberate indifference claim. Rather, they demonstrate just the opposite—a considered and immediate response to address Ryan's medical needs.

When Ryan returned from the hospital, Lommen reviewed Ryan's chart, noting the medication changes recommended by the hospital psychiatrist. (*Id.* ¶ 205.) At that time, Lommen recommended Ryan be evaluated by Dr. Sloan. (*Id.*) Later that afternoon, the Complaint alleges that "Ryan again attempted suicide by biting into his arm." (*Id.* ¶ 208.) In response, Ryan was placed in four-point restraints. (*Id.* ¶ 211.) While Plaintiffs are critical of this decision, there is no allegation that Lommen was involved in the decision to place restraints, nor even aware Ryan had bit into his arm and was in restraints for several hours. (*See id.* ¶¶ 210–17.)

Plaintiffs are critical that Lommen did not return Ryan to HCMC or elevate Ryan's level of care. (*Id.* ¶¶ 219–20.) But it is not enough for the Plaintiffs to simply assert that something more or different should have been done. Rather, the Court must look at whether what was done was constitutionally adequate. Here, the Complaint does not allege that Lommen was aware of any active suicidal ideation or other psychotic behavior at the time he treated Ryan. Instead, what the Complaint establishes Lommen knew was (1) Ryan had

just been evaluated and cleared by the hospital (*id.* ¶ 205); (2) Ryan's medications had been adjusted in the hospital to address his mental health diagnosis (*id.*); (3) Lommen had already recommended that Ryan be evaluated by Dr. Sloan (*id.*); and (4) Ryan remained on suicide precautions (*id.* ¶¶ 172, 202, 225). Deliberate indifference cannot be plausibly inferred from a nursing decision to not send a patient—who is on suicide precautions, with an active and updated medication regimen, who was just cleared by the hospital, and who already has a recommendation to be seen by a higher-level provider—back to the hospital.

Between January 14 and February 11, nursing staff performed suicide safety assessments for Ryan on at least 7 occasions, including at least two assessments performed by Lommen where he kept Ryan on suicide precautions. (*Id.* ¶¶ 221, 223, 224, 228, 231, 243, 256.) In addition, Ryan was seen and evaluated by Dr. Sloan during this time, and he also received another dose of long-acting Haldol Decanoate. (*Id.* ¶¶ 233, 247.) Suicide precautions were in place for this entire period. (*Id.* ¶¶ 172, 202, 225, 229, 231, 244, 254.) In addition, while the Complaint alleges that Ryan began to consistently refuse many of his doses of Benadryl and propranolol (*e.g.*, *id.* ¶¶ 245, 249), there are no allegations in the Complaint that Ryan was not med compliant with his antipsychotic medications during this time.[6]

After conducting a suicide risk assessment on February 11, Lommen made the nursing decision to remove Ryan from suicide precautions. (*Id.* ¶¶ 256, 264.) The

---

[6]     While the Complaint alleges that there was a *Jarvis* Order in place for Ryan's antipsychotics, the prescribed Benadryl and propranolol are not alleged to be, nor can be, a part of the *Jarvis* Order. Absent such an order, a patient has a right to refuse treatment or medication. *See, e.g.*, *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 277 (1990).

Complaint alleges Lommen made this decision despite information indicating Ryan "was at a heightened risk to commit suicide". (*Id.* ¶ 261.) But, to allege a plausible claim for deliberate indifference, it is not enough to simply conclusorily assert indifference, there must be factual allegations to support the assertion. Here, the facts alleged in the Complaint establish that Lommen made a nursing decision, which, when appropriately viewed prospectively, belies a plausible claim of indifference. Importantly, even if Lommen's decision was the wrong decision in hindsight, or even if the decision was made in poor judgment or negligently, that does not establish a constitutional violation.

Before Lommen removed Ryan from suicide precautions, he performed a suicide risk assessment. There is no allegation in the Complaint that the suicide risk assessment revealed a substantially high risk of suicide. Instead, the Complaint establishes that Lommen had the following information when exercising his nursing judgment to remove Ryan from suicide precautions: (1) Ryan had remained compliant with his antipsychotic medication regimen for two months, including three injections of long-acting Haldol Decanoate (*id.* ¶¶ 131, 166, 247); (2) Ryan had not reported commanding auditory hallucinations to harm himself for approximately 4 weeks (*compare* ¶ 223 (the last alleged commanding hallucination on January 16), *with* ¶ 259 (auditory hallucinations which did not command him to hurt himself)); (3) Ryan had not performed any self-injurious acts for approximately 5 weeks (*see id.* ¶ 208 (the last alleged self-injurious act on January 10)); (4) Ryan had not displayed any behavioral outbursts for nearly two months (*see id.* ¶ 133 (the last alleged "concerning and sporadic behavior, including calling Jail staff names, yelling, and kicking, banging, and pounding on his cell door" in mid-December)); and (5)

Ryan had not reported, nor had anyone else observed, any symptoms of either EPS or akathisia for approximately 5 weeks (*see id.* ¶¶ 182–86 (the only alleged observations of these symptoms on January 9)).

It was within Lommen's nursing judgment to weigh these factors against the alleged risk factors identified in the Complaint (*see id.* ¶ 261), when determining whether to remove Ryan from suicide precautions. And, importantly, Ryan's "previous suicidal tendencies do not require officials to regard him as indefinitely suicidal." *Francisco v. Corizon Health, Inc.*, 108 F.4th 1072, 1079 (8th Cir. 2024) (citing *Yellow Horse v. Pennington County*, 225 F.3d 923, 928 (8th Cir. 2000) (finding no deliberate indifference when the inmate was placed on, and removed from, suicide watch twice in the span of five days), and *Brabbit*, 59 F.4th at 354 (finding no deliberate indifference when officials removed inmate from highest level of supervision after inmate stated he was no longer suicidal)).

While Plaintiffs may assert that Lommen made the wrong decision to remove suicide precautions, even a wrong decision made with nursing judgment does not establish deliberate indifference. *See, e.g.*, *Luckert v. Dodge County*, 684, F.3d 808, 818 (8th Cir. 2012) (overturning a jury verdict and finding as a matter of law that nursing defendant who downgraded the decedent's suicide precautions was not deliberately indifferent); *Minix v. Canarecci*, 597 F.3d 824, 828–29, 833 (7th Cir. 2010) (concluding a nurse's decision to remove a pretrial detainee from suicide watch despite knowing the detainee had twice attempted suicide, once in the previous month, did not show deliberate indifference, even if "in hindsight the decision . . . might have been a mistake").

**B. Dr. Sloan and Lommen are entitled to Qualified Immunity.**

Dr. Sloan and Lommen are immune from suit in their individual capacities based on the qualified immunity defense doctrine. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Ulrich v. Pope County*, 715 F.3d 1054, 1062 (8th Cir. 2013). The Supreme Court has construed qualified-immunity protection to shield "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Application of qualified immunity requires a two-step inquiry: (1) whether the facts shown by Plaintiffs establish the HHS nurses violated a constitutional right; and (2) whether the right was clearly established at the time of the defendants' alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If the answer to either of these questions is "no," the defendant is entitled qualified immunity protections. *See Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 359 (8th Cir. 2023) "[T]he Supreme Court has repeatedly emphasized that qualified immunity should be determined at the earliest possible stage in litigation." *Krein v. Norris*, 250 F.3d 1184, 1188 (8th Cir. 2001) (citations omitted).

The first prong of qualified immunity requires the Plaintiffs to show facts in the Complaint that make out a violation of a constitutional or statutory right. *Pearson*, 555 U.S. at 232. Plaintiffs bring a claim broadly asserting Ryan's rights were violated when

Dr. Sloan and Lommen "knew that Ryan had serious medical needs that created a high risk of harm, including death, if not properly assessed, addressed, and monitored." (Compl. ¶ 340.) As discussed in the previous sections (*see supra* at pages 14–28), Plaintiff has fundamentally failed to plead any cognizable constitutional violations against Dr. Sloan and Lommen. Thus, the answer to first prong of this analysis is "no," and the Dr. Sloan and Lommen are entitled to qualified immunity.

As for the second prong, the Supreme Court has concluded that "'[c]learly established' means that, at the time of the . . . conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful" and that "the . . . conduct is 'beyond debate.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citations omitted). "The 'clearly established' standard also requires that the legal principle clearly prohibit the . . . conduct in the particular circumstances before [the official]. The rule's contours must be so well defined that it is 'clear to a reasonable [person] that [their] conduct was unlawful in the situation he confronted.' This requires a high 'degree of specificity.'" *Id.* (citations omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009).

Thus, this Plaintiffs must be able "identify[] controlling precedent with a close correspondence to the particulars of the present case." *Rusness v. Becker County*, 31 F.4th 606, 615 (8th Cir. 2022) (citing *Anderson*, 483 U.S. at 639–41; *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). The Supreme Court has cautioned against defining a plaintiff's constitutional

right with a "high level of generality". *Mullenix*, 577 U.S. at 12. "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.; See also Harmon v. Second Judicial Circuit*, 728 F. Supp. 3d 992, 1007-08 (E.D. Mo. 2022), *aff'd sub nom. Harmon v. Preferred Family Healthcare, Inc.*, 125 F.4th 874 (8th Cir. 2025) (qualified immunity was granted in a suicide case because plaintiff could not cite to sufficiently similar cases.)

The degree of specificity needed here is evident when comparing *Dadd v. Anoka County*, 827 F.3d 749, 756–57 (8th Cir. 2016), and *Leonard v. St. Charles Cnty. Police Dep't,* 59 F.4th at 362. In *Dadd,* a defendant nurse knew that the plaintiff suffered from a painful condition for which he had been prescribed pain medication, yet the defendant nurse intentionally failed to administer the medication. *Dadd*, 827 F.3d at 756-57. The *Dadd* Court determined that the nurse was not entitled to qualified immunity. *Id.* Later, in *Leonard,* a defendant nurse similarly decided not to administer medication for a patient's particularly painful eye condition in favor of putting plaintiff in the Suicide Prevention Unit. *Leonard*, 59 F.4th at 362. The *Leonard* Court determined that the nurse was entitled to qualified immunity analyzing that *Dadd* did "not clearly establish that [the nurse's] *particular* conduct was criminally reckless." *Id.* at 363 (citation omitted). *Leonard* went on to say that "it does not follow that *Dadd* would have placed [the nurse] on fair notice that her failure to take *further* action violated clearly established law." *Id.* (citation omitted). Even though these nurses took fundamentally the same steps, intentionally withholding prescribed pain medication, the contours of the specific facts made it so that the nurse in

*Leonard* did not violate a clearly established right and was therefore entitled to qualified immunity.

To withhold qualified immunity from government officials like Dr. Sloan and Lommen, there must be unambiguous, specific, and explicit caselaw established at the time of their conduct to show a violation of a clearly established right. Plaintiffs cannot show that. Thus, Dr. Sloan and Lommen are entitled to qualified immunity and should be dismissed from the claim.

### i.   *Dr. Sloan is entitled to Qualified Immunity.*

Plaintiffs' complaints against Dr. Sloan are that she "failed to properly re-evaluate or escalate Ryan's level of care in light of his recent noncompliance with prescribed medications (including propranolol and Benadryl), his ongoing placement in solitary confinement, and the Jail's recent decision to restrain him for over eight hours." (Compl. ¶ 238).

As a threshold matter, Plaintiff fails to plead any facts that establish that Dr. Sloan had any ability to determine if an inmate was assigned to solitary confinement at the jail or if he would be restrained for a certain amount of time. Even so, there is no established right here that Dr. Sloan would be on notice of. In *Hamner v Burls,* 937 F.3d 1171 (8th Cir. 2019), as amended (Nov. 26, 2019), the plaintiff pled that segregation posed a serious risk that was "pronounced for prisoners with mental illness" (*Id*. at 1178); that a certain cases put defendants on notice of such risk (*Id*.); and "that various studies on solitary conferment…placed defendants on notice of subjecting a prisoner with [ ] mental illness

prolonged administrative segregation violates the Eighth Amendment" (*Id*. at 1179). And yet, the *Hamner* Court found that the defendants were entitled to qualified immunity noting that in *Hamner* the "allegations identify a combination of circumstances that was not present in previous cases" and "[s]cholarly literature about negative effects of segregation may influence prison administrators and future court decisions, but it likewise does not establish that the constitutional question raised by Hamner was beyond debate in 2015." (*Id*.). Plaintiffs fail to establish Dr. Sloan was on notice of a clearly established right.

As to the Plaintiffs' allegation that Dr. Sloan should have re-evaluated medications based on Ryan's noncompliance, according to the Complaint, on January 27th, the last time Dr. Sloan saw Ryan, he was "mostly med compliant, except for regularly declining his morning Benadryl. (Compl. ¶ 230). Ryan had been prescribed Benadryl and propranolol to treat EPS and akathisia. (Compl. ¶ 192.) According to the Complaint, on January 27th, Dr. Sloan relied "primarily on Ryan's self-report that he was not currently experiencing EPS or akathisia". (Compl. ¶ 236); *See Smith-Dandridge v. Geanolous*, 97 F.4th 569, 577(noting that "[i]t was reasonable for defendants to take [the plaintiff's] response into account" where the plaintiff stated he was not at risk of suicide and later died by suicide). Dr. Sloan was entitled to believe her patient as he described his physical status, and she would not have been on notice that a change in medication was required to uphold Ryan's constitutional rights. Dr. Sloan is entitled to qualified immunity and should be dismissed.

### ii. *Lommen is entitled to Qualified Immunity.*

Plaintiffs' Complaint broadly alleges that Lommen "deviated so substantially from professional standards that it amounted to deliberate indifference" which appears to be rooted in Lommen's decision to remove Ryan from suicide watch. Lommen was not on notice that his medical decision to remove Ryan from suicide watch would violate his constitutional rights. Indeed, the opposite is true, in *A.H. v. St. Louis Cnty., Missouri*, the court affirmed the district court's dismissal of claims against a jail psychologist. 891 F.3d 721 (8th Cir. 2018). In *A.H.,* the patient had a history of suicide attempts and was on suicide protocol. *Id.* at 725. After being evaluated by a jail psychologist, the patient was cleared to return to the general population, however the patient committed suicide a week later. *Id*. As in *A.H.,* Lommen made careful medical assessments over the course of his fourteen medical visits with Ryan and determined that Ryan no longer had to be on suicide protocol. The Complaint contains no citation to a similarly situated case that would put Lommen on notice that his specific medical decision making was in violation of a clearly established constitutional right. Thus, Lommen is entitled to qualified immunity and should be dismissed from this case.

## II. Count II should be dismissed.

### A. Plaintiffs' *Monell* and/or *Canton* claims are not actionable.

If the Court dismisses the individual capacity claims above, the claims in Count II necessarily fail. Indeed, an entity can be held liable under § 1983 only if there is an underlying constitutional violation caused by the execution of a policy or custom. *See, e.g.*, *Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018) ("[A]bsent a constitutional

violation by [an] employee, there can be no § 1983 or *Monell* liability for the [entity].")
(citing *Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017)).

**B.     Plaintiffs' *Monell* and/or *Canton* claims are insufficiently pled.**

Plaintiffs have not sufficiently pled any specific policies or any customs or failures
to train—let alone *unconstitutional* policies, customs, or failures to train—and has
therefore failed to state a claim upon which relief can be granted.

Under *Monell*, § 1983 municipal liability attaches only where "the action that is
alleged to be unconstitutional implements or executes a policy statement, ordinance,
regulation, or decision officially adopted and promulgated by that body's officers." *Monell*,
436 U.S. at 690. To establish a governmental custom, a plaintiff must ultimately prove (1)
the "existence of a continuing, widespread, persistent pattern of unconstitutional
misconduct by the governmental entity's employees"; (2) "[d]eliberate indifference to or
tacit authorization of such conduct by the governmental entity's policymaking officials
after notice to the officials of that misconduct"; and (3) the "plaintiff's injury by acts
pursuant to the governmental entity's custom[.]" *Ware v. Jackson County*, 150 F.3d 873,
880 (8th Cir. 1998) (quoting *Jane Doe A ex rel. Jane Doe B v. Special Sch. Dist. of St.
Louis Cnty.*, 901 F.2d 642, 646 (8th Cir. 1990)) (cleaned up).

Because a custom must be demonstrated by a "continuing, widespread, persistent
pattern of unconstitutional misconduct", *id.*, an isolated incident generally "cannot, as a
matter of law, establish a municipal policy or custom creating liability under § 1983."
*Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013); *see also Bolderson v. City of
Wentzville*, 840 F.3d 982, 986 (8th Cir. 2016). Moreover, a plaintiff must show that

"officials had notice of prior incidents of . . . misconduct and had deliberately failed to act on this knowledge." *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987).

A municipality may also be liable under § 1983 if "the violation resulted from . . . a deliberately indifferent failure to train or supervise." *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019) (citation and punctuation omitted); *see also Canton*, 489 U.S. at 388–89. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citing *Bd. of Cnty. Comm'rs. of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

Critically, a plaintiff must allege specific facts that support the conclusion that an unconstitutional policy, custom, or failure to train existed to survive dismissal of a *Monell* claim. *Gherity v. Pfaff*, 216 F. Supp. 3d 975, 979–80 (D. Minn. 2016); *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004); *Ulrich*, 715 F.3d at 1061. Where a plaintiff fails to do so and instead makes only general, conclusory allegations about a municipality's custom or policy, the claim should be dismissed. *See, e.g.*, *D.B. v. Hargett*, No. CIV. 13-2781 MJD/LIB, 2014 WL 1371200, at *8 (D. Minn. Apr. 8, 2014); *Triemert v. Washington County*, No. 13-CV-1312 PJS/JSM, 2013 WL 6729260, at *11–12 (D. Minn. Dec. 19, 2013).

Here, Plaintiffs have failed to plausibly allege either (1) an official HHS policy that was deliberately chosen by an HHS official with "final authority" to establish the policy, *Ware*, 150 F.3d at 880; or (2) a custom or practice through the "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct" by HHS employees, of

which HHS officials had notice of prior to the underlying alleged misconduct, yet failed to act on it, *id.*; *Harris*, 821 F.2d at 504. Certainly, the Complaint is entirely devoid of any allegations representing an official HHS policy.

With respect to an unofficial custom or practice, the Complaint makes a conclusory allegation that HHS and "their final policymakers acted with deliberate indifference" through "customs, patterns, or practices" (Compl. ¶ 353), but, fatal to the claim, fails to allege specific facts to support the conclusion.

Instead, the Complaint relies on the tragic deaths or injuries of seventeen other detainees—five of whom died *after* Ryan—in an unsuccessful attempt to allege a custom or practice. (*Id.* ¶¶ 310–16, 321–34.) But this fails for several reasons. First, the allegations for each of these individuals are sparse at best, failing to plausibly allege sufficient detail to show the relevant similarity between the cases. *See, e.g.*, *D.B.*, 2014 WL 1371200, at *6. Indeed, other than two conclusory allegations that there were "failures to attend to . . . serious medical needs" (*id.* ¶ 316) and a "deliberate indifference to . . . medical needs" (*id.* ¶ 323) for two of the seventeen individuals (only one of which died by suicide), there are no factual allegations demonstrating the necessary similarity to the present case.

Moreover, for thirteen of the seventeen individuals identified, the Complaint alleges that the deaths were caused, at least in-part, by a purported failure to properly perform well-being checks. (*Id.* ¶¶ 310, 312, 313–16, 322, 325–30.) By rule, however, well-being checks are performed by jail staff, not medical staff. *See* MINN. R. pt. 2911.5000, subpt. 5 ("inmates are personally observed by a custody staff person"); MINN. R. pt. 2911.0200, subpts. 26, 40 (defining "custody personnel" as "those staff whose primary duty is

supervision of inmates" and "health care personnel" as "an individual whose primary duty is to provide health services in accordance with their respective license"). Thus, any claim premised on well-being checks necessarily fails against the HHS Defendants.

If you remove the five individuals who died after Ryan (and therefore could not have given an HHS official notice of *prior* incidents) (Compl. ¶¶ 326–30), and then from the remaining individuals, remove the four who did not die by suicide (and therefore are not sufficiently similar facts) (*id.* ¶¶ 322–23, 325, 332), and then from the remaining individuals, remove the five whose deaths are only alleged to be related to well-being checks (and therefore not applicable to HHS) (*id.* ¶¶ 310, 312–15), that leaves three individuals to form the basis of an alleged "custom or practice."

But the deaths by suicide, or attempted suicide, of three individuals over the course six years, of which no sufficiently similar facts have been asserted, fails to plausibly allege a "continuing, widespread, and persistent pattern of unconstitutional misconduct." *See, e.g.*, *Thelma D. ex rel. Delores A. v. Bd. of Educ. of St. Louis*, 934 F.2d 929, 933 (8th Cir. 1991) (noting that five prior incidents of alleged unconstitutional conduct over a 16-year period "cannot, as a matter of law, be said to comprise a persistent and widespread pattern of unconstitutional misconduct"). Moreover, other than conclusory boilerplate language, Plaintiffs' Complaint does not allege any factual allegations that HHS leadership or its policymaking officials had notice and or knowledge of these incidents and were deliberately indifferent to them. *See Atkinson v. City of Mountain View*, 709 F.3d 1201, 1216 (8th Cir. 2013) (finding a "bare allegation" of municipal deliberate indifference to be "patently insufficient").

Plaintiffs' final attempt at municipal liability against HHS is insufficiently pled failure to train claim, thinly asserting a "[failure] to train staff to work in a correctional setting and [a failure] to identify an inmate's risk for self-harm, suicidality, and/or death at the Jail." (Compl. ¶ 356.) The foregoing sentence represents the entirety of the allegations related to HHS's purported failure to train. It is clearly deficient. Indeed, Plaintiffs' conclusory allegations are strikingly similar to allegations that have repeatedly been found by this Court to be insufficient. *See, e.g.*, *Triemert*, 2013 WL 6729260, at *12, *and D.B.*, 2014 WL 1371200, at *5–6.

Because the Complaint fails to articulate sufficient facts that would allow this Court to reasonably infer any clearly identified unconstitutional policy, custom, practice, or lack of training, Plaintiffs' claims against HHS under Count II must be dismissed.

## III. The Court should decline to exercise jurisdiction over the state law claims.

The remaining claims in Counts III and IV are state tort actions alleging wrongful death and an injury action. This Court only has jurisdiction over these claims under the doctrine of pendent jurisdiction. 28 U.S.C. § 1367; *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

If Plaintiffs' § 1983 claims are dismissed, as they should be, this Court should dismiss the state claims without prejudice "for resolution to state tribunals." *Gibbs*, 383 U.S. at 726–27 ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For these reasons, the HHS Defendants respectfully request that Plaintiffs' § 1983 claims against them be dismissed with prejudice, and that the state law claims be dismissed without prejudice for resolution in the state court.

Dated: August 15, 2025                Respectfully submitted,

                                  MARY F. MORIARTY
                                  Hennepin County Attorney

                            By: */s/ Marissa K. Linden*
                                  MARISSA K. LINDEN (0395564)
                                  KATHERINE L CLANCY (0399739)
                                  Assistant Hennepin County Attorney
                                  2000A Government Center, MC200
                                  300 South Sixth Street
                                  Minneapolis, MN 55487
                                  Telephone: (612) 348-4782
                                  Marissa.Linden@hennepin.us

                                  *Attorneys for Hennepin Healthcare System, Inc., Laura Sloan, M.D., and Benjamin Lommen, R.N.*