UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Jill Myers and James Wodziak, *as co-trustees for the next of kin of Ryan Andrew Wodziak, Deceased*, | File No. 25-cv-2314 (ECT/ECW) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| Hennepin County, Minnesota; Hennepin Healthcare System, Inc.; Laura Sloan, M.D., *in her individual capacity*; and Benjamin Lommen, *in his individual capacity*, | |
| Defendants. | |

---

Jeffrey S. Storms, Naomi Martin, and Ryan O. Vettleson, Storms Dworak LLC, Minneapolis, MN, for Plaintiffs Jill Myers and James Wodziak.

Katherine Clancy and Marissa K. Linden, Hennepin County Attorney's Office, Minneapolis, MN, for Defendants Hennepin Healthcare System, Inc., Laura Sloan, and Benjamin Lommen.

Kelly K. Pierce and Sparrowleaf Dilts McGregor, Hennepin County Attorney's Office, Minneapolis, MN, for Defendant Hennepin County, Minnesota.

---

Ryan Andrew Wodziak died by suicide while detained at the Hennepin County Jail. Ryan's parents brought this case. They assert claims under federal and Minnesota law. The federal claims arise under § 1983. Ryan's parents claim that a physician, Laura Sloan, M.D., and a registered nurse, Benjamin Lommen, were deliberately indifferent to Ryan's serious medical needs in violation of the Fourteenth Amendment and that their deliberate indifference resulted in injuries to Ryan during his life and caused his death. The

Minnesota claims are for injury and wrongful death against all Defendants under Minnesota's wrongful-death/survival statute, Minn. Stat. § 573.02.

Dr. Sloan and nurse Lommen seek the federal claims' dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) and, if that request is granted, all Defendants argue I should decline to exercise supplemental jurisdiction over the remaining state-law claims. If a federal claim survives, then Defendants seek dismissal of Plaintiffs' requests for compensatory and punitive damages arising from their pre-death injury claims. According to Defendants, Plaintiffs may recover only special damages, not compensatory or punitive damages, for these claims.

The result is a mixed bag. (1) The operative Amended Complaint does not plausibly show that Dr. Sloan deliberately disregarded Ryan's constitutional rights, meaning the § 1983 claims against her will be dismissed. (2) The Amended Complaint plausibly alleges that nurse Lommen deliberately disregarded Ryan's constitutional rights, and it is not apparent from the face of the Amended Complaint that nurse Lommen is entitled to qualified immunity outright. (3) To the extent the Amended Complaint seeks recovery for Ryan's pre-death injuries, I conclude recovery is not limited to special damages.

I

In accordance with the standards governing Rule 12(b)(6) motions, the following facts are drawn entirely from the operative Amended Complaint [ECF No. 24]. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). For ease of reference, the Amended Complaint will be referred to simply as the "Complaint" and cited as "Compl."

*July 2021 through August 2022 – Ryan suffered from schizoaffective disorder, was placed under a Jarvis order, and was civilly committed.* Ryan suffered from schizoaffective disorder, "a severe mental health condition that combines symptoms of schizophrenia and mood disorders, and . . . carries a significantly high risk of suicide, with rates exceeding those of schizophrenia and mood disorders alone." Compl. ¶ 22. "In July 2021, Ryan was civilly committed as mentally ill to the Minnesota Department of Human Services . . . because he was experiencing 'delusional thoughts, paranoia, disorganization, labile mood, agitation, and limited insight.'" *Id.* ¶ 24. Due to the severity of his disorder and problems adhering to his antipsychotic-medication prescription, Ryan was placed under a so-called "*Jarvis* Order" that permitted Ryan's healthcare providers to "administer [Ryan's] prescribed antipsychotic medications without Ryan's consent and, if necessary, by using force." *Id.* ¶¶ 25–26.[1] One month later, in August 2021, Ryan was provisionally discharged into the community, though he remained under the *Jarvis* Order. *Id.* ¶ 27.[2] In November 2021, Ryan was "hospitalized with acute psychosis." *Id.* ¶ 28. Just a few days later, he was again provisionally discharged. *Id.* In February 2022, Dr. Sloan evaluated and interviewed Ryan and reviewed his medical records. *Id.* ¶ 29. "Dr. Sloan noted that Ryan did not demonstrate an understanding of the risks, benefits, and alternatives to treatment with neuroleptic medication and that he did not believe medications had been

---

[1]     Under Minnesota law, a court order approving the involuntary administration of neuroleptic medication is known as a "*Jarvis* order." *See Jarvis v. Levine*, 418 N.W.2d 139, 148 n.7 (Minn. 1988).

[2]     For a description of the provisional discharge process, see Minn. Stat. § 253B.18, subdivs. 7–14.

helpful to him." *Id.* ¶ 30.  Dr. Sloan "supported" Ryan's continued civil commitment and "opined that the *Jarvis* Order remained necessary." *Id.* ¶ 31.  "Ryan remained under civil commitment and the *Jarvis* Order." *Id.* ¶ 32.  In May 2022, Dr. Yoshiko Nakagawa Hapke evaluated Ryan at the Hennepin County Medical Center ("HCMC") Emergency Department and "noted [his] schizoaffective disorder diagnosis and history of suicidal ideation." *Id.* ¶ 33.  Ryan's provisional discharge was revoked in August 2022 following an incident that prompted law enforcement to bring him to a hospital. *Id.* ¶ 34.  Ryan was provisionally discharged the next day. *Id.* ¶ 35.

*October 2022 – Ryan is arrested and taken to the Hennepin County Jail, where medical staff do not see him promptly and do not provide or administer his prescribed medications.*  On October 3, 2022, Ryan went to the Hennepin County Government Center to address a citation while "in the midst of a mental health crisis." *Id.* ¶ 36.  While speaking with a clerk, Ryan became agitated. *Id.* ¶ 37.  Law enforcement was called, and officers "attempted to remove Ryan from the building and alleged that Ryan spit at them." *Id.* ¶¶ 37–38.  Ryan was charged with "felony assault" and taken to the Hennepin County Jail where he was held in custody. *Id.* ¶¶ 39–40.  On intake, the County's policy and procedures were violated when Jail staff "failed to conduct the required preliminary mental health screen" and Ryan was not seen by medical staff. *Id.* ¶¶ 41–42.  "Despite being under civil commitment and a *Jarvis* Order, Ryan was not provided with his prescribed medications, including his antipsychotics." *Id.* ¶ 43.  Ryan was first seen by Jail medical staff on October 11, 2022. *Id.* ¶ 44.  "Medical staff noted that Ryan had been acting 'weird,' had stated he had felt suicidal 'a long time ago when [he] was hung in a closet,' was 'paranoid and

manic,' and was not taking any antipsychotic medications at the Jail." *Id.* ¶ 45 (alteration in original).  "Ryan was ordered to receive three mental status checks per day; however, there is no documentation suggesting that these checks were ever conducted." *Id.* ¶ 46. "During some or all" of Ryan's initial period of detention, he was held in "'special management' housing under either 'protective custody' and/or 'administration segregation,' both of which in practice means Ryan was locked alone in a cell for 23 to 24 hours a day." *Id.* ¶ 47.  Nurse Lommen "noted that Ryan had a history of suicidal ideation and that there was concern that his mental status would worsen if he was left unmedicated." *Id.* ¶ 48.

*October 2022 – Ryan displays concerning behavior during and after a court hearing.*  One afternoon (the Complaint does not identify a date), Ryan was at a court hearing where "he displayed 'odd and aggressive behavior,' including banging his cuffs on the walls, rambling 'nonsense,' yelling at the judge, and pounding his shackled arms against the plexiglass separating him from the judge." *Id.* ¶ 49.  While being transported back to the Jail, a "spit hood" was placed over Ryan's head due to his "aggressive demeanor" and yelling.  *Id.* ¶ 50.  Later that evening, Ryan reported that his belongings had been stolen.  *Id.* ¶ 51.  When staff asked Ryan what had been stolen, Ryan replied, "Did your stuff get stolen?  Did someone steal your soul?" *Id.*

*October 2022 – Ryan is seen by Dr. Benjamin Hersey.*  The next afternoon, Jail psychiatrist Dr. Benjamin Hersey evaluated Ryan for "ongoing management of psychosis." *Id.* ¶ 52.  "Dr. Hersey reviewed Ryan's medical records, civil commitment history, and *Jarvis* Order," and "noted that Ryan had a history of severe and persistent mental illness,"

5

that Ryan "frequently referenced his belief that Dr. Hersey was lying," that Ryan "stated that he did not need medication, and that "Ryan was 'unable to comment on' whether he had suicidal ideation." *Id.* ¶¶ 53–55. Following his evaluation, Dr. Hersey did not prescribe or administer any medication to Ryan. *Id.* ¶ 56.

*October 2022 – Ryan continues not to receive his prescribed antipsychotic medication.* The day after he was evaluated by Dr. Hersey, Ryan requested his medication, but a Jail nurse responded that no medications had been ordered for Ryan. *Id.* ¶¶ 57–58. Jail medical staff relayed Ryan's request to Dr. Hersey, and on October 15, "Dr. Hersey ordered Ryan to take the antipsychotic Haldol, pursuant to the *Jarvis* Order." *Id.* ¶¶ 59–60. Despite Dr. Hersey's order, Jail staff failed to administer the Haldol, and on October 18, Ryan "was unhappy with not getting any meds he thought were ordered for him." *Id.* ¶¶ 61–62. "Nurse Lommen visited Ryan and noted Ryan had not received any antipsychotic doses as ordered." *Id.* ¶ 63. Despite this, nurse Lommen failed to administer Ryan's medication at that time (again, the Complaint does not identify the date of this encounter). *Id.* ¶ 64. "At times, Jail medical staff did not even attempt to provide Ryan with his prescribed antipsychotic medication." *Id.* ¶ 65. "The Jail medical staff also noted that Ryan did not receive his prescribed antipsychotic because he was unavailable, a no show, or refused." *Id.* ¶ 66.

*October 20 to October 31, 2022 – Ryan's mental health continues to deteriorate, and he does not receive his prescribed antipsychotic.* Ryan's mental health continued to decline, and his concerning behavior was "documented daily." *Id.* ¶ 68. "On October 20, 2022, Jail staff noted that Ryan was 'having a conversation with [him]self. Talking

6

nonsense; talking about smacking people around, reading books, GOD, killing people for fun.'" *Id.* ¶ 69 (alteration in original). "That same day, Ryan was allowed out of his cell and was later found 'standing in the dayroom naked' and [he] 'refused to get dressed.'" *Id.* ¶ 70. On October 21 or 22, Ryan was pepper sprayed after he demonstrated "unpredictable and odd behavior including threatening staff, yelling, punching his cell door, putting his hands through his food pass, and exposing himself." *Id.* ¶ 72. The Jail did not document that Ryan was pepper-sprayed, despite Jail policies and procedures requiring staff to do so. *Id.* ¶ 73. On October 24, registered nurse Laura Kernan charted that "patient has not taken a single dose of Haldol 5 mg that was prescribed on 10/15. When asked if he knew it was available to him he stated, 'I don't take Haldol.'" *Id.* ¶ 75. Though Ryan was not taking his antipsychotic medication, "this concern was not escalated." *Id.* ¶ 76. All told, Ryan was seen by a nurse six times during October. *Id.* ¶ 74.

*October 21, 2022, to his death on February 17, 2023 – Ryan is confined alone in a cell for between 23 and 24 hours each day.* "From at least October 21, 2022, until his death, Ryan was consistently held in 'special management' housing under either 'protective custody' and/or 'administration segregation . . . .'" *Id.* ¶ 71. While held in special management housing, Ryan was "eligible for one hour of exercise outside his cell per day 'unless security considerations dictate[d] otherwise.'" *Id.* ¶ 87. Despite this, Ryan was routinely confined to his cell for twenty-four hours per day; he was refused time outside of his cell at least forty-one times in the four months prior to his death. *Id.* ¶¶ 87, 89. Jail staff kept Ryan in his cell as punishment for "not participating in roll call," "not speaking to Jail staff," "keeping the slot in his cell door down," "not returning a lunch

tray," "having a 'constant attitude with staff,'" "displaying very odd behavior, rambling about nonsense," and "laughing to himself and mumbling random things." *Id.* ¶ 88.

*Late October through November 2022 – Ryan is seen by a nurse only once.* No documentation shows that Ryan was seen by any medical provider between October 25 and November 13. *Id.* ¶ 77. This violated the Jail's policies and procedures, which provided that, due to Ryan's placement in special management housing, he should have been seen by a member of the medical staff daily "unless medical attention [was] needed more frequently." *Id.* ¶ 78. Ryan was not seen by a doctor during November, and documentation indicates Ryan was seen by a nurse only once. *Id.* ¶¶ 79–80. That nurse visit occurred November 14 "in response to Ryan being tased for putting his arms through the food pass so the door could not be closed." *Id.* ¶ 79. "No one attempted to implement Ryan's *Jarvis* Order to ensure he received his necessary antipsychotic medications," meaning Ryan did not receive any of the Haldol he had been ordered to receive a month prior.[3] *Id.* ¶¶ 81–82. On November 22, certified nurse practitioner Malack Nyokwoyo reviewed Ryan's medical records without seeing Ryan. *Id.* ¶¶ 90–91. Documentation reflects "Ryan had not been outside of his cell for nearly three consecutive weeks at this time." *Id.* ¶ 92. "Despite numerous documented instances of Ryan threatening Jail staff

---

3       The Complaint alleges that Jail staff and/or Hennepin Healthcare staff "failed to comply with Jail policy regarding administering medications to patients under a *Jarvis* Order by" (1) "failing to document Ryan's daily medication administration"; (2) "failing to notify the mental health team immediately upon Ryan's refusal to take his prescribed medication"; (3) "documenting 'no show' for times Ryan did not receive his medication"; (4) failing to review Ryan's need for administration of medication when Ryan refused oral medication"; and (5) "failing to remind Ryan to take his court ordered medication." Compl. ¶ 83.

and other inmates, [nurse practitioner] Nyokwoyo noted 'nursing and deputies report no expressed lethality from the inmate directed toward self or others, inclusive of intent or plan.'"  *Id.* ¶ 93.  Nurse practitioner Nyokwoyo ordered that Ryan's Haldol be discontinued.  *Id.* ¶ 94.

*Late November 2022 – Ryan is found incompetent to stand trial and continues to display concerning behavior.*  Later on November 22, Ryan was found incompetent to stand trial in his felony assault case, and the matter was suspended until he could be restored to competency.  *Id.* ¶ 95.  On November 24, "Ryan urinated under his cell door multiple times."  *Id.* ¶ 96.  On November 28, Jail staff noted the following: "[Ryan was] putting water and garbage underneath his door today.  Inmate has shown severe mental health problems and is not fit for the dayroom today."  *Id.* ¶ 97.  Two days later, Jail staff documented the following observation: "[Ryan was] stuffing food and random items under his cell door.  Inmate stood up and stared at me and was whispering.  I asked him what was going on and he just continued."  *Id.* ¶ 98.  By this time, "Ryan had spent nearly the entire month of November without stepping foot outside of his cell—not even to shower."  *Id.* ¶ 99.

*December 1 to December 2, 2022 – Ryan's mental health continues to decline.*  On December 1, "a Jail nurse noted that Jail staff were concerned about Ryan as he 'seems to continue to mentally decline.'"  *Id.* ¶ 100.  The nurse further noted:

> [Ryan] seen with a lot of garbage in front of cell, standing staring through window at [me] but declines to respond to any of [my] questions.  Per deputy [Ryan] has been having conversations with 2 people who are not there in cell and makes voices for each person responding and laughing

9

> hysterically at times inappropriately to unknown things.
> Mental health nurse advised.

*Id.* (alterations in original) (sic throughout).  On December 2, Ryan urinated under his door. *Id.* ¶ 101.  "Ryan also made several extremely graphic and nonsensical comments that plainly demonstrated he was experiencing active and severe psychosis." *Id.* ¶ 102.

*December 2, 2022 – Dr. Sloan examines Ryan, orders that he receive Haldol, and recommends he be transferred to the Acute Psychiatric Services (or "APS") department.* Dr. Sloan examined Ryan on December 2.  *Id.* ¶ 103.  "Dr. Sloan was listed as Ryan's 'treating physician,'" *id.* ¶ 104, though the Complaint does not indicate when this designation occurred, *see id.*  "Dr. Sloan saw Ryan in his cell for 'ongoing management of psychosis' and was unable to perform a review of systems and side effects because of Ryan's 'severe psychosis.'" *Id.* ¶ 105.  Dr. Sloan "noted that Ryan laid in his bed, did not answer her questions, said 'Pow, release the dragon,' and otherwise mumbled incoherently to himself." *Id.* ¶ 106.  She further noted that "Ryan was '[c]urrently civilly committed with *Jarvis* Order,' that he had not received medication since he arrived at the Jail, was responding to internal stimuli, and that Ryan's 'mental health has been severely deteriorating.'" *Id.* ¶ 107.  Following her examination, "Dr. Sloan recommended Ryan be transferred to HCMC's Acute Psychiatric Services department." *Id.* ¶ 108.  However, due to insufficient Jail staffing, Ryan was not transported to APS; the failure to transfer Ryan violated Jail policy.  *Id.* ¶¶ 108–09.  Though he remained at the Jail, Ryan was given 10 mg of Haldol pursuant to the *Jarvis* Order.  *Id.* ¶ 110.  "Nurse Lommen noted that Ryan did not resist receiving the injection." *Id.* ¶ 111.  "Ryan was also ordered to receive a

loading dose[4] of 100 mg of Haldol Decanoate, which is a long-acting form of Haldol." *Id.* ¶ 112.

*December 2 to December 12, 2022 – Ryan's Haldol Decanoate is delayed, and he continues to display erratic behavior.* The Jail nurses did not promptly administer Ryan's Haldol Decanoate because they did not have the proper needle. *Id.* ¶ 114. The following day, "Jail staff noted that Ryan threw garbage and feces under his cell door." *Id.* ¶ 115. "Nurse Lommen noted that he would 'follow up tomorrow, with the plan to encourage oral Haldol dosing, to avoid need for forced Haldol decanoate.'" *Id.* ¶ 117. On December 4, Jail staff noted the following: "[Ryan had] urine and feces [protruding] from under his door. . . . Inmate may be cycling downwards again since his last medication." *Id.* ¶ 118 (second and third alterations in original). Nurse Lommen visited Ryan and noted: The "quad deputy reports [Ryan's] mood is 'worse today', including urinating under door, pushing feces under door, screaming, etc. [Ryan] seen standing at doorway, would not verbally reply to [my] questions. He only shook his head, rolled his eyes, and stuck up his middle finger." *Id.* ¶ 119 (alterations in original). Ryan was not given his antipsychotic that day. *Id.* ¶ 120. On December 5, Ryan received a loading dose of 100 mg of Haldol Decanoate by injection. *Id.* ¶¶ 121–22. Ryan did not resist. *Id.* ¶ 122. On December 6, Jail staff noted that Ryan "continues to display odd behavior," including "speaking incoherently while staring through the cell door." *Id.* ¶ 123. On December 7, Jail staff noted that Ryan "appears to be going downhill again and cannot follow staff directives."

---

[4] "A loading dose of medication is used to quickly achieve therapeutic drug concentrations or prompt an immediate clinical response." Compl. ¶ 113.

*Id.* ¶ 124.  On December 8, nurse Lommen visited Ryan's cell and noted: "[Ryan is] kneeling in front of toilet, scooping water/feces into a bag. . . .  While this is still concerning behavior, [Ryan] appears better than previous interactions and the fact that he is engaging in an activity other than previous catatonic-like state is reassuring." *Id.* ¶ 125 (second and third alterations in original).  On December 9, "Ryan told Nurse Lommen that he was willing to take his antipsychotic medication orally." *Id.* ¶ 126.  After nurse Lommen communicated with Dr. Sloan about Ryan taking his medication orally, Dr. Sloan was "fine to order oral Haldol but prefers to get injection as previous planned." *Id.* ¶¶ 127–28 (sic throughout).  Ryan ultimately received a 5 mg dose of Haldol on December 9, but he did not receive Haldol the following day. *Id.* ¶¶ 130–31.  On December 12, Ryan received a loading dose of 100 mg Haldol Decanoate without resistance via injection. *Id.* ¶¶ 132–33.  "For the next three days, Ryan engaged in concerning and sporadic behavior, including calling Jail staff names, yelling, and kicking, banging, and pounding on his cell door." *Id.* ¶ 134.

*December 17, 2022 – Ryan attempts suicide and is taken to the APS where he is evaluated by Dr. Hapke.*  On December 17, Ryan attempted suicide by chewing a vein out of his arm. *Id.* ¶ 135.  At approximately 8:30 p.m., Ryan bit and tore into his flesh using his incisors, which left wounds on his left wrist, arm, and inner elbow. *Id.* ¶ 136.  "Ryan told Jail nurses that he was 'going to chew into the veins and bleed to death.  Why don't you just shoot me and get it over with? I am ready to die!'" *Id.* ¶ 137.  Ryan was put on suicide precautions and placed in a restraint chair. *Id.* ¶ 138.  Jail staff noted that, while in the restraint chair, Ryan "rambled self harm statements" and stated, "I promise I won't hurt

myself anymore.  I'll plan for a different day." *Id.* ¶ 139.  Around 10:30 p.m., Ryan was taken to APS where he was evaluated by Dr. Hapke. *Id.* ¶ 140.  Ryan denied he was experiencing suicidal ideation, and Dr. Hapke discharged Ryan back to the Jail reasoning that Ryan "says he is safe for discharge, so [he] will be discharged." *Id.* ¶¶ 143–44 (alteration in original).  "Dr. Hapke noted that he had asked a Jail nurse to keep Ryan 'on suicide watch while in a jail.'" *Id.* ¶ 145.  Ryan was brought back to the Jail around midnight. *Id.* ¶ 146.  Ryan remained on suicide precautions—including well-being checks at 15-minute intervals—for less than a day. *Id.* ¶¶ 147–48.

*December 18, 2022 – Nurse Lommen removes Ryan from suicide precautions.* Nineteen hours after Ryan's suicide attempt, nurse Lommen removed him from suicide precautions. *Id.* ¶ 148.  "Nurse Lommen noted that Ryan was 'frustrated that he remains in jail' and that he explained to Ryan that Ryan was under a mental health hold, waiting for a 'bed.'" *Id.* ¶ 149.  By this time, Ryan had been held in pre-trial detention at the Jail for more than two months, spending nearly all this time in solitary confinement. *Id.* ¶ 150.

*December 23, 2022 – Ryan says he wants to die.*  On December 23, "Ryan experienced auditory hallucinations, believed he had a device in his throat, and expressed a desire to die." *Id.* ¶ 152.  "Jail staff noted that Ryan had asked to 'see a mental health nurse because he was hallucinating and hearing voices in his head' and 'stated that the voices were telling him that he was a bad person and that the devil will come and get him soon.'" *Id.* ¶ 153.  Nurse Lommen visited Ryan and "noted that Ryan had confirmed he was 'struggling with' auditory hallucinations," and that Ryan stated, "[t]here's also a device in my throat, see?" *Id.* ¶¶ 154–55.  Ryan "placed both fists on either side of his

13

throat and stated, 'The device prevents me from crushing my windpipe.'" *Id.* ¶ 156. Nurse Lommen inquired why Ryan would want to crush his windpipe, to which Ryan responded, "[b]ecause I want to die." *Id.* ¶¶ 157–58. Nurse Lommen told Ryan that he would be placed on suicide precautions if he had a plan to hurt himself, in response to which Ryan "denied any intent to harm himself" and "reiterated 'I want to die, but I'm not going to do anything about it.'" *Id.* ¶¶ 159–60.

*December 23, 2022, to January 2, 2023 – Dr. Sloan sees Ryan and orders that he receive consistent Haldol Decanoate injections, and Ryan receives an initial injection.* Later that day, Ryan met with Dr. Sloan for "ongoing management of psychosis." *Id.* ¶ 161. Dr. Sloan noted that Ryan was civilly committed, that he was the subject of a *Jarvis* Order, and that he "had auditory hallucinations about 30 minutes to an hour earlier and 'somatic delusions earlier today.'" *Id.* ¶¶ 162–63. Dr. Sloan ordered that 150 mg injections of Haldol Decanoate be administered to Ryan once every four weeks, beginning January 2, 2023. *Id.* ¶ 164. Dr. Sloan saw Ryan again on December 30. *Id.* ¶ 165. After again noting that Ryan was civilly committed and the subject of a *Jarvis* Order, Dr. Sloan noted that he was waiting to be transferred to inpatient psychiatric care. *Id.* ¶ 166. On January 2, 2023, Ryan received the first 150 mg injection of Haldol Decanoate that Dr. Sloan had ordered. *Id.* ¶ 168.

*January 3 to January 4, 2023 – Ryan's civil commitment and Jarvis Order are extended.* On January 3, Hennepin County requested that Ryan's civil commitment be extended, noting that he had "decompensated, with severely disorganized speech and

behavior as well as constant auditory hallucinations." *Id.* ¶ 169.  On January 4, Ryan's

civil commitment and *Jarvis* Order were extended.  *Id.* ¶ 170.

      *January 9, 2023 – Ryan attempts suicide a second and third time.*  On January 9,

2023, Ryan attempted suicide.  *Id.* ¶ 171.  "Jail staff noted that Ryan expressed being

suicidal and had attempted suicide by tying a sheet around his neck to hang himself from

a stool."  *Id.* ¶ 172.  "Ryan told a Jail nurse 'that there was a device in his neck that is

telling him to kill himself.'"  *Id.* ¶ 173.  "Ryan was placed on suicide precautions."  *Id.*

¶ 174.  Roughly fifteen minutes later, Ryan again attempted suicide by chewing through

his wrist veins.  *Id.* ¶ 175.  He "told a Jail nurse that he was hearing voices that told him to

hurt himself."  *Id.* ¶ 176.  "Ryan was placed in restraints to prevent him from biting his

flesh," but he "bit his tongue until it bled and told [a] Jail nurse 'that he cannot control his

voices,' and that 'they keep telling him to bite his tongue and now he did it.'"  *Id.* ¶¶ 177–

78.  Nurse Lommen visited Ryan and "noted Ryan had bloody saliva dripping off his chin."

*Id.* ¶ 179.  During the visit, "Ryan told Nurse Lommen that he had been lying about doing

better and admitted that he continued to have auditory hallucinations instructing him to

harm himself."  *Id.* ¶ 180.

      *January 9, 2023 – Ryan is taken to APS where he is evaluated by Dr. Thomas Keul.*

At around 9:40 a.m. (after his visit with Nurse Lommen), Ryan was transported to APS.

*Id.* ¶ 181.  There, Ryan was evaluated by Dr. Thomas Keul, who documented that Ryan

"exhibited active psychotic symptoms and self-harm behavior, had 'grossly psychotic

symptoms,' was unable to care for himself, and complained of 'voices.'"  *Id.* ¶ 182.  "Ryan

insisted he could not stop harming himself due to the voices and could not stop bouncing

his legs." *Id.* ¶ 184. Ryan told Dr. Keul he was experiencing auditory and visual hallucinations, that the voices would continue unless he harmed himself, that he had previously attempted suicide by biting into his arm and almost reached a vein, and that "he feels [he] must move and has intense inner anxiety." *Id.* ¶¶ 183, 185. Dr. Keul diagnosed Ryan with "[a]kathisia due to antipsychotic medications," extrapyramidal symptoms ("EPS") "due to antipsychotic medications," and schizophrenia, which "appear[ed] to be in partial remission." *Id.* ¶ 186. Dr. Keul documented that Ryan's EPS was "obvious." *Id.* ¶ 188. EPS "are drug-induced movement disorders that cause stiffness, tremors, rigidity, and involuntary muscle contractions, commonly resulting from antipsychotic medications like Haldol." *Id.* ¶ 187. "Akathisia is a neuropsychiatric syndrome marked by an inability to remain still, intense psychomotor restlessness," severe emotional distress, "and overwhelming inner agitation—typically concentrated in the lower extremities." *Id.* ¶¶ 189–90. Akathisia is a known side effect of Haldol and is "a recognized risk factor for suicide," particularly for persons prescribed high-potency antipsychotics including Haldol. *Id.* ¶¶ 190–91. Due to these diagnoses, Dr. Keul discontinued Ryan's oral Haldol, recommended reducing the Haldol Decanoate injection from 150 mg to 100 mg, and prescribed an additional antipsychotic medication (that is not identified in the Complaint). *Id.* ¶ 193. Dr. Keul also prescribed Benadryl (diphenhydramine) four times per day to treat Ryan's EPS, and propranolol three times per day to address Ryan's akathisia. *Id.* ¶ 194. Dr. Keul's decision to prescribe both Benadryl and propranolol at such high frequencies reflected the severity of Ryan's symptoms and the necessity of continuous symptom relief. *Id.*

*January 9, 2023 – Ryan meets with certified nurse practitioner Tambra Herrmann.* Following his appointment with Dr. Keul, Ryan was monitored for several hours, and after that he was evaluated by CNP Tambra Herrmann. *Id.* ¶ 195. "CNP Herrmann noted that Ryan was 'not making threats to kill himself but he did say that him being locked up for 23 hours a day makes the voices tell him to bite himself and tell him to kill himself.'" *Id.* ¶ 196. CNP Herrmann further documented that Ryan "begged" to be put in inpatient psychiatric care at APS. *Id.* ¶ 197. CNP Herrmann informed Ryan that he would be brought back to the Jail and cautioned that if he continued self-harming behavior he would be placed in the restraint chair to prevent him from harming himself. *Id.* ¶ 198. Ryan told CNP Herrmann that he "is in a cell by himself for 23 hours a day and he has nobody to talk to because of his behavior," *id.* ¶ 199 (citation modified), to which CNP Herrmann responded that he should "stay in control and not act out and act aggressive towards others to get himself in this position," *id.* ¶ 200 (citation modified). CNP Herrmann ultimately determined that Ryan was not psychotic, discharged him back to the Jail around midnight, and instructed that Ryan be sent back to HCMC or the closest emergency room "if new or worsening symptoms occur." *Id.* ¶¶ 202–03.

*January 10, 2023 – Ryan returns to the Jail, and shortly afterward he attempts suicide a fourth time.* When Ryan arrived back at the Jail, a nurse charted that he was to remain under suicide precautions and that he had new medication orders, including:

17

"Benadryl 50mg QID,[5] Inderal (propranolol) 20mg TID,[6] Zyprexa 10mg @HS and Zyprexa 5mg BID PRN for psychosis/agitation." *Id.* ¶¶ 204–05.   Zyprexa is an antipsychotic medication, and the order indicated Ryan was to receive 10 mg of Zyprexa every night at bedtime and receive an extra 5 mg dose twice a day as needed in the event he became agitated or psychotic. *Id.* ¶ 206. On the afternoon of January 10, nurse Lommen looked over Ryan's chart, noted the modifications to his medication regimen, and recommended Ryan be evaluated by Dr. Sloan for a medication review. *Id.* ¶ 207. At 2:26 p.m. that same afternoon, Ryan declined wound care for the bite wounds on his wrist. *Id.* ¶ 208.   "Declining wound care is a recognized indicator of ongoing suicidal ideation, particularly in individuals with recent self-harm, active psychosis, or a history of suicide attempts." *Id.* ¶ 209.   One hour after declining wound care, Ryan attempted suicide yet again by biting into his arm. *Id.* ¶ 210.

*January 10, 2023 – Ryan is placed in four-point restraints for eight hours.* Ryan told Jail staff "he could not 'stop the voices from hurting himself.'" *Id.* ¶ 211.  In response, Jail staff placed Ryan under four-point restraints. *Id.* ¶ 212.  Jail staff "repeatedly" documented that Ryan appeared "visually ok," but Ryan remained in the restraints for roughly eight hours. *Id.* ¶ 213.  Ryan was not evaluated by a doctor during his time in the restraints, and documentation indicates that Jail nurses checked on him only six times during those eight hours. *Id.* ¶¶ 214–15.  Registered nurse Paul Boyum, a Hennepin

---

[5]     "QID" means medication is to be administered four times per day.  Compl. ¶ 194.

[6]     "TID" means medication is to be administered three times per day.  Compl. ¶ 194.

Healthcare employee, knew from the electronic medical records that Ryan was to return to HCMC. *Id.* ¶ 216. However, nurse Boyum "approved of and charted on Ryan's restraint" at least five times while Ryan was in the restraints. *Id.* "[T]here is no available documentation suggesting Ryan was provided with water, food, or the ability to use the restroom while in the restraints." *Id.* ¶ 217. Those who were involved with "Ryan's extended restraint violated numerous policies and procedures, including by keeping Ryan restrained longer than was necessary, failing to assess whether Ryan needed to return to [APS], and failing to monitor, assess, and document Ryan's mental health during the use of restraints." *Id.* ¶ 218.

*January 11 to January 26, 2023 – Ryan meets with nurse Lommen and other health care providers, who keep him on suicide precautions.* On January 11 at 10:00 a.m.— roughly ten hours after Ryan's release from the restraints—Ryan saw nurse Lommen. *Id.* ¶¶ 219–20. "Nurse Lommen knew that Ryan was supposed to be returned to HCMC or another emergency department for worsening symptoms or behaviors." *Id.* ¶ 221. Nevertheless, after meeting with Ryan, nurse Lommen recommended that Ryan be returned to a cell. *Id.* ¶ 222. Three days later, nurse Lommen met with Ryan to conduct a suicide safety assessment. *Id.* ¶ 223. Ryan reported that his auditory hallucinations had improved somewhat since his medication changes, but he stated, "I still can't control it." *Id.* ¶ 224. On January 16, another Hennepin Healthcare Jail nurse conducted a suicide risk assessment, and Ryan again stated that he was experiencing auditory hallucinations and that "he is unable to ignore them and they badger him into hurting himself." *Id.* ¶ 225. On January 18, Hennepin Healthcare Jail nurse Mahaman Nekere evaluated Ryan for risk of

suicide and observed that Ryan had a "flat and blunted affect." *Id.* ¶ 226.  Nurse Nekere continued to keep Ryan on suicide precautions.  *Id.* ¶ 227.  A "flat or blunted affect is a well-documented clinical indicator of severe psychiatric distress and increased suicide risk, particularly in individuals with a history of self-harm, psychosis, and suicidality." *Id.* ¶ 228.  A "flat affect," which is "the absence of normal emotional expression," is "not a sign of stability but rather a red flag for worsening mental illness, emotional withdrawal, and potential resignation to suicide." *Id.*  And "a sudden reduction in emotional expression, withdrawal, or lack of outward distress does not equate to safety," but rather, "it often signals severe depression, emotional numbing, and the psychological 'quiet before the storm' that precedes suicide." *Id.*  On January 20, Ryan again declined wound care for the self-inflicted wound on his arm.  *Id.* ¶ 229.  On January 21, nurse Nekere again observed that Ryan had a "flat and blunted affect" during another suicide risk assessment and continued Ryan's suicide precautions.  *Id.* ¶¶ 230–31.  Ryan continued to decline wound care over the next few days, but he remained "mostly" compliant with his medications, except that he regularly declined his morning dose of Benadryl.  *Id.* ¶ 232.  On January 26, nurse Nekere observed that Ryan had "a flat affect" during another evaluation and continued Ryan on suicide precautions.  *Id.* ¶ 233.

*January 27, 2023 – Ryan is evaluated by Dr. Sloan.*  On January 27, Ryan refused his morning doses of both propranolol and Benadryl. *Id.* ¶ 235.  That afternoon, Ryan was evaluated by Dr. Sloan for ongoing management of his psychosis. *Id.* ¶ 236.  Dr. Sloan knew of Ryan's diagnosis of akathisia and EPS, as well as his self-harm, blunted affect, and suicide attempts. *Id.*  She also knew Ryan was being held in solitary confinement and

that such confinement could cause harm to someone suffering from serious psychological instability, particularly someone with active psychosis, continuing auditory hallucinations, medication-induced movement disorders, and multiple suicide attempts. *Id.* ¶ 237. Dr. Sloan also knew that Ryan had declined to take his medications that morning. *Id.* ¶ 238. During her evaluation, Dr. Sloan noted that Ryan continued to exhibit a blunted affect, but she "relied primarily on Ryan's self-report that he was not currently experiencing EPS or akathisia and elected to maintain the same antipsychotic regimen that had previously caused those serious side effects." *Id.* ¶ 239. Dr. Sloan noted that a change in antipsychotic medication "may be of benefit," but she "deferred to Ryan's preference to remain on Haldol, merely reducing the dosage in accordance with Dr. Keul's earlier recommendation, rather than initiating a safer alternative." *Id.* ¶ 240. Dr. Sloan kept Ryan on Haldol, though she acknowledged it was a "high risk medication," and she further ordered that Ryan continue to receive Benadryl 50 mg four times per day and propranolol 20 mg three times per day. *Id.* ¶ 243.

*January 27 to February 10, 2023 – Ryan continues to refuse certain medications and remains on suicide precautions.* After his visit with Dr. Sloan, Ryan continued to miss doses of propranolol "regularly," including missing six doses in four days. *Id.* ¶ 244. A failure to receive propranolol as prescribed for akathisia "can increase someone's risk of attempting suicide." *Id.* ¶ 245. On February 1, Ryan was again evaluated by nurse Nekere for a suicide risk assessment. *Id.* ¶ 246. Nurse Nekere observed Ryan had "a flat affect during this interaction," "encouraged" Ryan to take his medications, and continued Ryan on suicide precautions. *Id.* ¶¶ 246–47. "Ryan began consistently refusing his doses of

21

Benadryl and propranolol," as well as wound care. *Id.* ¶¶ 248–49. On February 2, Ryan received an injection of 100 mg of Haldol Decanoate. *Id.* ¶ 250. The following day, nurse Lommen noted that Ryan was "laughing loudly to self while in cell." *Id.* ¶ 251. Ryan continued refusing his Benadryl and propranolol; between February 1 and February 10, he accepted only one third of the prescribed propranolol and less of the prescribed Benadryl. *Id.* ¶¶ 252–53. Nurse Lommen and other Jail medical staff knew Ryan was declining his medications and that he continued to display a flat affect. *Id.* ¶ 254. Nurse Lommen and other Jail medical staff "did not take any action to ensure Ryan received his akathisia medication as prescribed." *Id.* ¶ 255.

*February 11, 2023 – Nurse Lommen removes Ryan from suicide precautions.* Ryan was on suicide precautions until February 11, when nurse Lommen evaluated Ryan for a suicide risk assessment, and ultimately cleared Ryan to be removed from suicide precautions. *Id.* ¶¶ 257, 259, 269. Until that day, Ryan had refused "at least" twenty doses of propranolol and even more doses of Benadryl. *Id.* ¶ 258. Despite records reflecting Ryan's "sustained noncompliance with medications," nurse Lommen charted that Ryan "has remained med compliant." *Id.* ¶¶ 260–61. Nurse Lommen documented that Ryan was still experiencing auditory hallucinations, which Ryan admitted "can get to [him]." *Id.* ¶ 262. "Ryan's continued auditory hallucinations are consistent with the failure to adequately treat Ryan's known serious mental illness, including the improper management of his prescribed medications and the side effects those medications were prescribed to mitigate, i.e., akathisia and EPS." *Id.* ¶ 263. Nurse Lommen did not assess or document the effects continued solitary confinement may have had on Ryan's mental state or suicide

risk. *Id.* ¶ 267. Nurse Lommen did not consult with Ryan or arrange for Ryan to be evaluated by a physician despite his medication noncompliance and "deteriorating psychiatric presentation." *Id.* ¶ 268.

*February 17, 2023 – Ryan dies by suicide.* Because Ryan was removed from suicide precautions, he was no longer subject to 15-minute well-being checks and was moved to a new area where time checks occurred every 25 minutes. *Id.* ¶ 270. Ryan remained in solitary confinement and was permitted to leave his cell for only one hour per day. *Id.* ¶ 272. Ryan's new cell contained a bed sheet. *Id.* ¶ 271. After his transition to the new area, "Ryan continued to consistently decline propranolol, Benadryl, and wound care." *Id.* ¶ 273. No one evaluated Ryan for suicide risk between February 11 and February 17, even though Ryan "continued to exhibit serious and concerning symptoms of mental illness and/or psychosis that necessitated heightened medical treatment." *Id.* ¶¶ 274–75. By February 17, Ryan had been detained in solitary confinement for roughly four consecutive months. *Id.* ¶ 276. Jail staff failed to properly conduct the 25-minute well-being checks, "as they either barely glanced inside Ryan's cell or merely walked past his cell without looking in." *Id.* ¶ 277. At 5:08 p.m. on February 17, Jail staff removed a food try from the food slot in Ryan's cell and looked inside his window for less than a second. *Id.* ¶ 278. At 5:34 p.m.—his next well-being check—a member of the Jail staff found Ryan hanging with a sheet around his neck. *Id.* ¶¶ 280–81, 283. Ryan was transported to HCMC where he was declared brain dead. *Id.* ¶¶ 284–85. Three days later, on February 20, Ryan was taken off life support. *Id.* ¶ 286.

*February to September 2023 – Ryan's death is reviewed by the DOC and Hennepin County.*   On February 22, the Inspection and Enforcement Unit of the Minnesota Department of Corrections ("DOC") opened a review into Ryan's death.  *Id.* ¶ 295.  In connection with the DOC review, Hennepin County inaccurately reported that Ryan had not previously attempted suicide, that he was committed under a "non-48 hours mental health" hold, and that he was not classified as a vulnerable adult under Minnesota law.  *Id.* ¶ 296.  Though Hennepin County was required to conduct a "death review" within 90 days of Ryan's death, it did not complete the review until September 6, 2023, and it concluded that it would not implement any "recommendations for changes in policy, procedure, or training."  *Id.* ¶¶ 297–99.  The DOC found that "multiple well-being checks were missed and that checks were fraudulently recorded," and on September 7, it sent findings to the Hennepin County Sheriff that cautioned: "Additionally, the well-being check that was not conducted but documented as such is a very serious violation.  A repeat of **fraudulent** documentation around well-being checks will result in further corrective action."  *Id.* ¶¶ 300–01.  The DOC ordered Hennepin County to take corrective action, though it is unclear what that entailed.  *Id.* ¶ 302.

*June 2025 – Plaintiffs file this case.*  Plaintiffs assert four claims. (1) Through 42 U.S.C. § 1983, Plaintiffs claim Dr. Sloan and nurse Lommen were deliberately indifferent to Ryan's medical needs up to but excluding his death, in violation of the Fourteenth

Amendment.[7]  Compl. ¶¶ 303–15.  (2) Through § 1983, Plaintiffs claim Dr. Sloan and nurse Lommen were deliberately indifferent to Ryan's medical needs that caused his death, in violation of the Fourteenth Amendment.  Compl. ¶¶ 316–28.  (3) Plaintiffs bring a wrongful death claim against all Defendants under Minnesota Statutes section 573.02, subdivision 1.  *Id.* ¶¶ 329–41.  (4) Plaintiffs bring an injury action under Minnesota Statutes section 573.02, subdivision 2, against all Defendants.  Compl. ¶¶ 342–45.  For relief, Plaintiffs seek compensatory, special, and punitive damages, attorneys' fees and costs, and "such other and further relief as this Court deems just and equitable."  *Id.* at 44–45.

II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept all the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

---

[7]     The Complaint asserts violations of the Eighth and Fourteenth Amendments for both Counts I and II.  *See* Compl. ¶¶ 303–28.  Plaintiffs have since acknowledged, however, that just the Fourteenth Amendment applies to their claims.  ECF No. 37 at 16 n.1.

A

The primary issue is whether Dr. Sloan and nurse Lommen possess qualified immunity.[8]  In determining whether defendants have qualified immunity, two questions are answered: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009); *see Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021).  Courts may consider the questions in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  A § 1983 plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes.  *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).  "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'"  *Kong Tr. ex rel. Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)), *cert. denied sub nom.*, *Kong v. City of Burnsville*, 141 S. Ct. 2839 (2021).

---

[8]    The Complaint includes many allegations regarding individuals other than Dr. Sloan and nurse Lommen.  "To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights."  *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (citation omitted).  "[L]iability for damages under § 1983 is personal, and 'each defendant's conduct must be independently assessed. Section 1983 does not sanction tort by association.'"  *Starks v. St. Louis County*, No. 4:21-CV-435, 2024 WL 940410, at *7 (E.D. Mo. Mar. 5, 2024) (quoting *Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014)), *motion for relief from judgment denied*, 2024 WL 3204041 (E.D. Mo. June 26, 2024), *and aff'd*, 159 F.4th 1146 (8th Cir. 2025); *see Mitchell*, 160 F.4th 950, 957 (8th Cir. 2025) (noting a plaintiff must allege "*each particular defendant* actually knew of but deliberately disregarded [his] serious medical need" (citation modified) (emphasis added)).  The Complaint gives no reason to attribute other individuals' actions (or inactions) to Dr. Sloan or nurse Lommen.  Their conduct will not factor in the qualified-immunity analysis.

The interplay between qualified immunity and the motion-to-dismiss procedural posture deserves mention. The United States Supreme Court and our Eighth Circuit Court of Appeals "repeatedly have stressed the importance of resolving [qualified] immunity questions at the earliest possible stage in litigation." *Payne v. Britten*, 749 F.3d 697, 701 (8th Cir. 2014) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)). In the Rule 12(b)(6) context, a court is to "ask only whether the facts as alleged plausibly state a claim and whether that claim asserts a violation of a clearly established right," *id.* at 702, or to put it another way, "whether immunity is established on the face of the complaint," *Schatz Fam. ex rel. Schatz v. Gierer*, 346 F.3d 1157, 1159 (8th Cir. 2003) (per curiam), *see Elder v. Gillespie*, 54 F.4th 1055, 1062 (8th Cir. 2022); *Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018); *see also Watkins v. City of St. Louis*, 102 F.4th 947, 951 (8th Cir. 2024) ("To overcome qualified immunity at the motion to dismiss stage, a plaintiff must plead facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." (citation modified)).

1

The constitutional right to medical care possessed by pretrial detainees and civilly committed individuals "arises under the Due Process Clause of the Fourteenth Amendment." *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014); *Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014). The standard applied in this context "borrow[s] from the Eighth Amendment deliberate-indifference standard applicable to claims of prison inmates." *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017) (alteration in original)

(quoting *Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016)).  "Whether an official was deliberately indifferent entails both an objective and a subjective analysis," and the application of the standard is a "factually-intensive inquiry."  *Scott*, 742 F.3d at 339–40 (citation modified); *see Schaub v. VonWald*, 638 F.3d 905, 914–15 (8th Cir. 2011).  To prove deliberate indifference, a plaintiff "must show that (1) he suffered from objectively serious medical needs, and (2) the defendants actually knew of, but deliberately disregarded, those needs."  *Mead v. Palmer,* 794 F.3d 932, 936 (8th Cir. 2015).

A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Presson v. Reed*, 65 F.4th 357, 366 (8th Cir. 2023) (quoting *Davis v. Buchanan County*, 11 F.4th 604, 623–24 (8th Cir. 2021)); *accord Mitchell*, 160 F.4th at 957.  A "serious medical need" may encompass the timeliness of treatment.  *See Presson*, 65 F.4th at 366–67.  In other words, in many cases, a serious medical need is defined not merely by the need for treatment but also by the need for the treatment to be administered promptly or within a certain period.  *See id.*

The Complaint alleges facts plausibly showing that Ryan had several serious medical needs.  (i) Ryan was diagnosed with schizoaffective disorder, which the Complaint alleges is "a severe mental health condition that combines symptoms of schizophrenia and mood disorders."  Compl. ¶ 22.  And he was prescribed antipsychotic medications to treat the disorder.  *See id.* ¶ 25.  The decision to place Ryan under a *Jarvis* order highlighted the seriousness of Ryan's medical need for neuroleptic medications.  *See id.* ¶¶ 25–26. (ii) Apart from the formal schizoaffective-disorder diagnosis, Ryan suffered from "a

history of severe and persistent mental illness," *id.* ¶ 54, and his frequent strange behaviors made it possible for a layperson to recognize Ryan's need for medical treatment, *see, e.g.*, *id.* ¶ 49 (describing Ryan's behavior during a court proceeding); *id.* ¶ 125 (describing Ryan's in-custody behavior). (iii) As part of their motion to dismiss, Dr. Sloan and nurse Lommen conceded that Ryan's "risk of suicide" represented an "objectively serious medical need." ECF No. 33 at 16.

The Complaint identifies two medical needs that will not factor in the analysis, each for a distinct reason. First, the Complaint implies that Ryan possessed a serious medical need not to be placed in solitary confinement. *See* Compl. ¶¶ 237, 267, 291, 293–94. However, the Complaint does not allege that a physician diagnosed this need, nor does the Complaint allege facts plausibly showing that Ryan's medical need not to be in solitary confinement would have been obvious to a layperson. The alleged need for Ryan not to be in solitary confinement is thus not a "serious medical need" for the Fourteenth Amendment's purposes. Second, Ryan attempted suicide three times by biting through his skin "to chew into the veins and bleed to death." *Id.* ¶ 137; *see id.* ¶¶ 175, 210. The Complaint plausibly alleges that these attempts resulted in significant wounds that required medical treatment. *See id.* ¶¶ 136, 175, 207–210. Though these wounds plausibly created serious medical needs, Plaintiffs do not rely on them as support for their § 1983/Fourteenth Amendment deliberate-indifference claims. *See generally* ECF No. 37.

Several rules apply to answer whether Dr. Sloan and nurse Lommen knew of but deliberately disregarded one or more of Ryan's serious medical needs. Answering whether a defendant knew of a serious medical need seems best described as a common-sense, fact-

29

specific inquiry. *See, e.g.*, *Stewart v. Garcia*, 139 F.4th 698, 709–10 (8th Cir. 2025) (identifying several facts from which jury might reasonably find that defendant knew of plaintiff's medical need); *Mitchell*, 160 F.4th at 957 (recognizing that "[a] defendant's actual knowledge may be inferred 'from the very fact that the risk was obvious'" (quoting *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008))). Deliberate disregard may be shown through allegations that a defendant failed to respond at all to a detainee's medical needs or provided "'[g]rossly incompetent or inadequate care' where 'the treatment is so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'" *Mitchell*, 160 F.4th at 957 (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1240–41 (8th Cir. 1997)). "Mere negligence or medical malpractice . . . are insufficient to rise to a constitutional violation." *Id.* (quoting *Dulany*, 132 F.3d at 1239); *see Smith v. Clarke*, 458 F.3d 720, 724 (8th Cir. 2006) ("Malpractice alone is not actionable under the [E]ighth [A]mendment."). "[D]eliberate indifference 'requires a mental state akin to criminal recklessness.'" *Mitchell*, 160 F.4th at 957 (quoting *Buckman*, 756 F.3d at 1065); *see Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006) (recognizing that the required mental state is "akin to criminal recklessness: disregarding a known risk to the inmate's health"). "As long as this threshold is not crossed, [detainees] have no constitutional right to receive a particular or requested course of treatment, and . . . doctors remain free to exercise their independent medical judgment." *Dulany*, 132 F.3d at 1239; *see Fourte v. Faulkner County*, 746 F.3d 384, 387 (8th Cir. 2014) (recognizing that "mere

disagreement with treatment decisions does not rise to the level of a constitutional violation" (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000))).[9]

The Complaint contains allegations plausibly showing that Dr. Sloan and nurse Lommen knew of Ryan's serious medical need for antipsychotic medications to treat his schizoaffective disorder and related mental-health conditions. As early as February 2022, the Complaint alleges, Dr. Sloan expressed her view that these medications were necessary to treat Ryan's schizoaffective disorder through her support of Ryan's continued civil commitment and ongoing implementation of the *Jarvis* Order. Compl. ¶¶ 29–31. The Complaint also alleges that "Dr. Sloan was listed as Ryan's 'treating physician,'" creating the plausible inference that she was familiar with his condition and prescribed medications. *Id.* ¶ 104. The Complaint includes many allegations plausibly showing that nurse Lommen knew about Ryan's need for his prescribed medications, including allegations that nurse Lommen had responsibility for administering the medications, documented whether Ryan's medications had (or had not) been administered, and discussed Ryan's medications with Dr. Sloan. *See id.* ¶¶ 48, 63–64, 117, 126–128, 133.

---

[9] Plaintiffs argue that they are "not, at the motion to dismiss stage, required to present evidence that each defendant actually and affirmatively knew of the serious medical need, as well as, [sic] proof that each defendant consciously made the specific inference of that serious medical need based on the facts known to that defendant." ECF No. 37 at 21. To support this characterization of the law, Plaintiffs cite *Ryan*, 850 F.3d at 426, and *Thompson v. King*, 730 F.3d 742, 746–47 (8th Cir. 2013). ECF No. 37 at 21. I have carefully reviewed these cases. They do not support Plaintiff's characterization. To be clear, I understand the law to require a plaintiff asserting a § 1983 deliberate-indifference-to-medical-needs claim to allege facts plausibly showing each defendant's knowledge of the serious medical need.

The Complaint's allegations do not plausibly show that Dr. Sloan deliberately disregarded Ryan's serious medical need for his prescribed antipsychotic medications. After first evaluating Ryan in February 2022, Dr. Sloan's next contacts with Ryan occurred near the end of that year, on December 2. *Id.* ¶ 103. Though Dr. Sloan noted that Ryan "had not received medication since he arrived at the Jail," *id.* ¶ 107, the Complaint does not allege that Dr. Sloan knew before December 2 that Ryan had not been receiving his prescribed medications. And after that date, the Complaint alleges that Dr. Sloan took steps to ensure that Ryan received his antipsychotic medications. *See id.* ¶¶ 110, 112, 128, 164, 239–40, 243. To the extent the Complaint addresses this question, it seems to fault Dr. Sloan for maintaining the antipsychotic-medication regimen she prescribed originally. *See id.* ¶ 239. Though the Complaint alleges this regimen came with "serious side effects," *id.*, it does not allege facts plausibly showing that Dr. Sloan's prescription regimen itself deliberately disregarded one or more of Ryan's serious medical needs. Without more, allegations concerning the drawbacks or side effects of the antipsychotic medications Dr. Sloan prescribed show only disagreements with treatment decisions. *Dulany*, 132 F.3d at 1239.

The Complaint plausibly alleges that nurse Lommen deliberately disregarded Ryan's need for his prescribed medications. As early as October 18, the Complaint alleges, nurse Lommen "did not administer Ryan's antipsychotic medication." *Id.* ¶ 64. Again, when Dr. Sloan visited Ryan in his cell on December 2, 2022, she documented that Ryan "had not received medication since he arrived at the jail," *id.* ¶ 107, and a plausible inference from the Complaint's many allegations regarding nurse Lommen is that he had

32

significant and sometimes primary responsibility for ensuring that Ryan received his medications, *see id.* ¶¶ 64, 120, 254, 256, 258. The Complaint alleges nurse Lommen did not administer Ryan's prescribed medications on several subsequent dates. *See id.* ¶¶ 120, 254, 256, 258. The allegation that nurse Lommen "falsely charted that Ryan 'has remained med[ication] compliant'" plausibly shows nurse Lommen knew the risks associated with Ryan not receiving his prescribed medications. *Id.* ¶ 260; *see id.* ¶ 261. It is true that some allegations cut the other way. The Complaint acknowledges, for example, that Ryan's noncompliance prevented him from receiving prescribed medications, *see, e.g.*, *id.* ¶ 238, but Ryan wasn't always noncompliant, *see, e.g.*, *id.* ¶ 133, and the *Jarvis* Order would have enabled nurse Lommen to forcibly administer Ryan's medications. And though the Complaint acknowledges that Ryan received his medications on several occasions, *see, e.g.*, *id.* ¶¶ 110–11, 121–22, 130–133, the pleading nonetheless plausibly shows that nurse Lommen's deliberate disregard resulted in Ryan's medications being administered sporadically and irregularly. That is enough given the serious nature of Ryan's underlying mental-health diagnoses and nurse Lommen's awareness of Ryan's need for his prescribed medications.

The Complaint does not plausibly allege that Dr. Sloan deliberately disregarded Ryan's serious medical need for treatment and precautions regarding his suicide risk. Again, the Complaint alleges that in February 2022, Dr. Sloan examined Ryan and supported the ongoing prescription and administration of antipsychotic medications, including forcibly if necessary pursuant to the *Jarvis* Order. *Id.* ¶¶ 29–31. The Complaint does not allege that she examined Ryan again until early December 2022. *Id.* ¶ 103. The

Complaint gives no reason to think that anything Dr. Sloan did (or did not do) between October and December 2022 shows she deliberately disregarded Ryan's suicide-risk-related medical needs; Dr. Sloan is not mentioned at all in the Complaint's recounting of the facts between those dates. *See id.* ¶¶ 32–102. During her examination on December 2, 2022, Dr. Sloan noted "that Ryan's 'mental health has been severely deteriorating,'" and she recommended, among other things, that Ryan be transferred to the Acute Psychiatric Services Department at HCMC. *Id.* ¶ 108. Though this transfer did not occur, the Complaint explicitly faults "low Jail staffing"—not anything Dr. Sloan did or did not do—as the reason the transfer did not occur. *Id.* In a visit with Ryan later that same month, Dr. Sloan documented Ryan's symptoms and ordered that he continue to receive prescribed antipsychotic medications. *Id.* ¶¶ 161–66. Dr. Sloan also noted "that Ryan was waiting to be transferred to inpatient psychiatric care," *id.* ¶ 166, but the Complaint includes no allegations plausibly showing that Dr. Sloan was responsible for the delay in transferring Ryan pursuant to her recommendation. As far as the Complaint alleges, Dr. Sloan last examined Ryan on January 27, 2023. *See id.* ¶¶ 235–43. She noted Ryan's "history of self-harm, blunted affect, and repeated suicide attempts." *Id.* ¶ 236. She was aware Ryan had refused some of his medications. *Id.* ¶ 238. And she continued to prescribe antipsychotic medications to treat Ryan's mental-health conditions, though she reduced the dosage of one medication. *See id.* ¶¶ 239–243. The Complaint alleges that Dr. Sloan's care was not optimal—that the prescribed medications came with "serious side effects," that there was a "safer alternative" to Ryan's Haldol prescription, and that the "jail setting" and "medication regimen" contributed to Ryan's "psychiatric decline and suicidality." *Id.*

34

¶¶ 239–40, 242. Without more, these allegations reflect treatment-decision disagreements; they do not plausibly show "a mental state akin to criminal recklessness." *Mitchell*, 160 F.4th at 957 (citation modified).

The Complaint plausibly alleges that nurse Lommen deliberately disregarded Ryan's serious medical need for treatment and precautions regarding his suicide risk. This conclusion is a logical extension from the conclusion that nurse Lommen deliberately disregarded Ryan's need for his prescribed medications. The Complaint alleges that without the consistent administration of his prescribed medications, Ryan's suicide risk increased significantly. *See, e.g.*, Compl. ¶¶ 253–56. And the Complaint alleges that nurse Lommen knew of Ryan's "heightened risk to commit suicide" based on numerous facts, *id.* ¶ 266, but "cleared Ryan to be removed from suicide precautions," *id.* ¶ 269. This meant "Ryan was taken off the 15-minute well-being checks and moved into a new quad, where time checks were lengthened to standard and less frequent 25-minute well-being checks." *Id.* ¶ 270. Between nurse Lommen's failure to administer Ryan's prescribed medications and his decision to remove suicide precautions in the face of many facts suggesting Ryan remained a significant suicide risk, the Complaint plausibly alleges the required criminal-recklessness mental state.

2

The rules governing the qualified-immunity analysis's second prong are settled and straightforward, if sometimes difficult to apply. "For purposes of the second prong, [courts] look to 'the legal rules that were clearly established at the time' the action at issue was taken." *Graham v. Barnette*, 5 F.4th 872, 881 (8th Cir. 2021) (quoting *Davis v. Hall*,

35

375 F.3d 703, 711 (8th Cir. 2004)).  As the Eighth Circuit has explained, a plaintiff can show that a right was clearly established in three different ways:

> [A plaintiff] may identify existing circuit precedent involving sufficiently similar facts that squarely governs the situation. Or a plaintiff may point to "a robust consensus of cases of persuasive authority" establishing that the facts of [his] case make out a violation of clearly established right.  Finally, a plaintiff may show, in rare instances, that a general constitutional rule applies with "obvious clarity" to the facts at issue and carries the day for [him].

*L.G. ex rel. M.G. v. Columbia Pub. Schs.*, 990 F.3d 1145, 1147–48 (8th Cir. 2021).  In the deliberate-indifference context specifically, the Eighth Circuit has explained that "[f]or qualified-immunity purposes, rights are not defined at a broad level of generality."  *Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2021).  "The Supreme Court has clearly stated that in establishing qualified immunity, the test must be applied at a level of specificity that approximates the actual circumstances of the case."  *Id.* (quoting *Engleman v. Deputy Murray*, 546 F.3d 944, 949 n.4 (8th Cir. 2008)); *cf. id.* at 587–88 ("Framed at the level of specificity that the Supreme Court mandates for our analysis, we understand the specific question we must answer to be as follows: 'Does a transferring officer violate a pretrial detainee's Fourteenth Amendment rights by failing to inform a receiving entity that the detainee is on a close-observation status if a mental health professional has determined that the detainee is not suicidal and if the applicable close-observation status is, in and of itself, indicative of the absence of a suicide risk?'"); *see Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 363 (8th Cir. 2023) ("The clearly established principle from *Dadd* [*v. Anoka County*, 827 F.3d 749 (8th Cir. 2016)] is that a *complete* failure to treat an extremely

36

painful (or other serious) condition displays a reckless indifference to a serious medical need."); *see also Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (per curiam) (explaining in the Fourth Amendment context that "the relevant precedent must define the right with a high degree of specificity, so that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply, and that "principles stated generally, such as that an officer may not use unreasonable and excessive force, do not suffice" (citation modified)).

Here, framed at the required level of specificity, the primary question is whether, between October 2022 and February 2023, it was clearly established that a jail nurse violated a detainee's Fourteenth Amendment rights by failing to administer the detainee's prescribed medications, and the answer is yes. This Eighth Circuit addressed this issue in *Presson*, 65 F.4th at 369–70. There, the court explained that an earlier Eighth Circuit case, *Dadd*, made clear that a jail official violates a detainee's constitutional rights when the "official denies a person treatment that has been ordered or medication that has been prescribed." *Presson*, 65 F.4th at 369–70 (quoting *Dadd*, 827 F.3d at 757). "In *Dadd*, the pretrial detainee 'arrived at the jail with instructions from his doctor in the form of a Vicodin prescription, and the deputies and the jail nurse ignored his complaints of pain and requests for treatment. When [the pretrial detainee] was prescribed additional medication by a jail doctor, he did not receive it.'" *Id.* at 370 (alteration in original) (quoting *Dadd*, 827 F.3d at 757). As described above, that is what the Complaint plausibly alleges happened here: Dr. Sloan (and perhaps other physicians) prescribed antipsychotic medications for Ryan, but nurse Lommen frequently did not administer them. This, in turn,

37

plausibly resulted in injuries to Ryan before he died by suicide and plausibly caused Ryan to take his own life.

It is true that this case involves additional allegations that might ultimately shade this "clearly established" question. For example, the Complaint seems to acknowledge that Ryan sometimes refused his medications. *See, e.g.*, Compl. ¶¶ 25–26, 30, 75, 238. Notwithstanding his occasional refusals, the *Jarvis* Order authorized the forcible administration of Ryan's antipsychotic medications. *Id.* ¶ 26. Depending on discovery and how Plaintiffs ultimately choose to present their Fourteenth Amendment claims, it may prove necessary to account for these additional facts as part of the "clearly established" analysis regarding nurse Lommen's failure to provide Ryan with his prescribed medications. For the time being, the plaintiff-friendly reading of the Complaint is that Ryan often expressed a need for, or did not resist, the administration of his prescribed medications, *see id.* ¶¶ 57, 62, 111, 122, 126–130, 132–33, and the Complaint plausibly alleges that nurse Lommen deliberately disregarded Ryan's clearly established Fourteenth Amendment right to receive prescribed medications. That is enough at the motion-to-dismiss stage.

Nurse Lommen's decision to remove Ryan from suicide precautions poses a separate question, and the better answer is that this right was not clearly established in the relevant sense. Again, framed at the required level of specificity, the question is whether, in February 2023, it was clearly established that a jail nurse violated a detainee's Fourteenth Amendment rights by removing a detainee from "suicide precautions" so that "well-being checks" went from occurring every 15 minutes to every 25 minutes. *Id.* ¶¶ 269–70.

Plaintiffs cite no binding case or robust consensus of cases addressing this or a sufficiently analogous question. That is enough to reject this liability theory. Cases addressing the issue at the deliberate-indifference level do not support the theory. *See A.H. v. St. Louis County*, 891 F.3d 721, 727 (8th Cir. 2018) (holding clinical psychologist did not act with deliberate indifference when she discharged deceased from the infirmary even though she knew he had "several 'historical' and 'situational' risk factors for suicide"); *Luckert v. Dodge County*, 684 F.3d 808, 818–19 (8th Cir. 2012) (holding nurse did not act with deliberate indifference by downgrading deceased from a twenty-minute to a thirty-minute suicide watch even though he had recently attempted suicide); *Yellow Horse v. Pennington County*, 225 F.3d 923, 927–28 (8th Cir. 2000) (holding corrections officer did not exhibit deliberate indifference when she removed deceased from suicide watch after he had attempted suicide just days before); *see also Francisco v. Corizon Health, Inc.*, 108 F.4th 1072, 1079 (8th Cir. 2024) ("[A]n inmate's previous suicidal tendencies do not require officials to regard him as indefinitely suicidal."), *cert. denied sub nom.*, *Francisco v. England*, 145 S. Ct. 1332 (2025).

B

There is a question whether Plaintiffs are limited to seeking only "special damages" for their § 1983/Fourteenth Amendment claim arising from nurse Lommen's care for Ryan up to but excluding his death. *See* Compl. ¶¶ 303–15 (Count I); *see id.* ¶ 304 ("The allegations of this Count are specifically directed at the conduct of Dr. Sloan and Nurse Lommen to the extent their violations of Ryan's constitutional rights are found to have caused constitutional injury but not his death."). "It is well established that 42 U.S.C.

39

§ 1988 requires courts to apply state law to questions of survival of federal civil rights actions as long as the state law is not inconsistent with the Constitution and laws of the United States." *Parkerson v. Carrouth*, 782 F.2d 1449, 1451 n.3 (8th Cir. 1986) (citing *Robertson v. Wegmann*, 436 U.S. 584, 588–90 (1978)); *see Estate of Guled ex rel. Abdi v. City of Minneapolis*, 869 F.3d 680, 683 (8th Cir. 2017) (explaining that, because "§ 1983 does not make clear who constitutes the injured party when the injured party dies," a court must apply state law to answer the question unless it is "inconsistent with the Constitution or federal law" (citation modified)). This includes questions regarding the availability of damages. *See Andrews v. Neer*, 253 F.3d 1052, 1063–64 (8th Cir. 2001). *See generally Sharbaugh v. Beaudry*, 267 F. Supp. 3d 1326, 1329–34 (N.D. Fla. 2017).

The parties agree that Minnesota Statutes section 573.02, subdivision 2, applies to the § 1983/Fourteenth Amendment claim for Ryan's pre-death pain and suffering in Count I. *See* ECF No. 33 at 35–36; ECF No. 37 at 23–24. Before May 2023, that provision authorized recovery of "special damages" only. *See* 2023 Minn. Laws ch. 52, art. 19, § 34. "Special damages" as used in section 573.02 refers to "those damages to which an exact dollar amount can be assigned, such as medical expenses or lost wages to date of death." *Deal v. Northwood Child.'s Home Soc'y, Inc.*, 608 N.W.2d 922, 925 n.1 (Minn. Ct. App. 2000) (citing *Beaudry v. State Farm Mut. Auto. Ins.*, 518 N.W.2d 11, 12 n.1 (Minn. 1994)); *see Miller v. Soo Line R.R.*, 925 N.W.2d 642, 656–57 (Minn. Ct. App. 2019) (noting that "special damages" are damages that "are ascertainable in an exact dollar amount"). In addition to special damages, however, Plaintiffs seek via Counts I and III to recover compensatory and punitive damages. Compl. ¶¶ 313–14; *id*. at 44 ¶ 1.

40

Plaintiffs argue that a May 2023 amendment to section 572.02, subdivision 2, that expanded the statute to enable an appointed trustee to recover "all damages arising out of such injury" applies retroactively to their claims in this case. 2023 Minn. Laws ch. 52, art. 19, § 34.[10] This contention is persuasive. Section 573.02 includes a retroactivity provision that reads as follows:

> **Applicability.** This section shall not apply to any death or cause of action arising prior to its enactment, nor to any action or proceeding now pending in any court of the state of Minnesota, except, notwithstanding section 645.21, this section shall apply to any death or cause of action arising prior to its enactment which resulted from an intentional act constituting murder, and to any such action or proceeding now pending in any court of the state of Minnesota with respect to issues on which a final judgment has not been entered.

Minn. Stat. § 573.02, subdiv. 4. As the Minnesota Court of Appeals explained, "[i]n 1983, the Minnesota Legislature amended the wrongful death statute, Minn. Stat. § 573.02 (1983), to permit punitive damage awards." *Swenson v. Emerson Elec. Co.*, 356 N.W.2d 313, 318 (Minn. Ct. App. 1984). Subdivision 4 was directed at that amendment. In other words, the subdivision made clear that § 573.02 (and its punitive-damage amendment) did

---

[10]    Plaintiffs do not argue that section 573.02, subdivision 2's special-damages limitation is "inconsistent with the Constitution [or] laws of the United States." 42 U.S.C. § 1988(a); *see Robertson*, 436 U.S. at 588–90. At least one judge in this District has explicitly concluded that the special-damages limitation imposed by section 573.02, subdivision 2, passes that standard. *Sheeley v. City of Austin*, No. 12-cv-2525 (ADM/SER), 2015 WL 3576115, at *4–5 (D. Minn. June 5, 2015) (Montgomery, J.); *see Crocker v. City of Minneapolis*, Civ. No. 4-85-923, 1986 WL 266, at *2 (D. Minn. July 3, 1986) (Murphy, J.) (finding Minnesota's survival statute "is not inconsistent with federal civil rights laws"); *see also Vought v. Ellis*, No. 10-cv-4388 (JRT/SER), 2012 WL 4090061, at *1–2 (D. Minn. Sep. 17, 2012) (applying section 573.02, subdivision 2's special-damages limitation to enter summary judgment against § 1983 claim).

"not retroactively apply to lawsuits not resulting from an intentional act constituting murder." *Swenson*, 356 N.W.2d at 319. The subdivision's reference to "its enactment" is therefore best understood as applying to the 1983 enactment. Defendants have cited no authority showing that the subdivision's reference to "its enactment" was intended to encompass all subsequent enactments or amendments to section 573.02. An effective-date clause in the 2023 session law provided that "[t]his section is effective the day following final enactment and applies to causes of action pending on or commenced on or after that date." 2023 Minn. Laws ch. 52, art. 19, § 34. "Final enactment" "means the date and time of day the governor signed the bill." Minn. Stat. § 645.01, subdiv. 2 (2023). The governor signed the bill May 19, 2023, at 12:32 p.m. *See* 2023 Minn. Laws ch. 52. Under the session law's effective-date provision, the 2023 amendment applies here because Plaintiffs commenced this action in 2025.

*

To summarize: (1) The Complaint does not plausibly show that Dr. Sloan deliberately disregarded Ryan's constitutional rights, meaning the § 1983 claims against her will be dismissed. Because these claims "might conceivably be repleaded with success," the dismissal will be without prejudice. *Behr v. Radisson Hotels Mgmt. Co., LLC*, No. 24-cv-2183 (ECT/DJF), 2025 WL 1360699, at *11 (D. Minn. May 9, 2025) (citation modified). (2) The Complaint plausibly alleges that nurse Lommen deliberately disregarded Ryan's constitutional rights. It is not apparent from the face of the Complaint that nurse Lommen is entitled to qualified immunity for his failure to administer Ryan's prescribed medications. It is apparent that nurse Lommen is entitled to qualified immunity

42

for his decision to remove Ryan from suicide precautions.  Again, this decision will be without prejudice to Plaintiffs' right to seek leave to amend the Complaint to address this specific issue.  (3) To the extent the Complaint seeks recovery for Ryan's pre-death injuries, I conclude recovery is not limited to "special damages."

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.  Hennepin County's Motion to Dismiss First Amended Complaint [ECF No. 26] is **DENIED**.

2.  Defendants Hennepin Healthcare System, Inc., Benjamin Lommen, and Laura Sloan, M.D.'s Motion to Dismiss [ECF No. 31] is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.  The Motion is **GRANTED** with respect to the claims against Defendant Laura Sloan, M.D., and the claims against her are **DISMISSED WITHOUT PREJUDICE**.

b.  The Motion is **GRANTED** with respect to the claims against Defendant Benjamin Lommen arising from his decision to remove Ryan from suicide precautions, and these claims are **DISMISSED WITHOUT PREJUDICE**.

c.  In all other respects the Motion is **DENIED**.

Dated:  April 27, 2026                                  s/ Eric C. Tostrud
                                                        Eric C. Tostrud
                                                        United States District Court

43
